1  Gary M. Kaplan (State Bar No. 155530)
   gkaplan@fbm.com
2  Farella Braun + Martel LLP
   235 Montgomery Street, 17th Floor
3  San Francisco, CA  94104
   Telephone:  (415) 954-4400
4  Facsimile:  (415) 954-4480

5  Proposed Attorneys for Debtor in Possession
   YELLOW CAB COOPERATIVE, INC.

6

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12 In re                                Case No.  16-30063

13 YELLOW CAB COOPERATIVE, INC.,[1]     Chapter 11

14          Debtor.

15

16

17

18 **DECLARATION OF PAMELA MARTINEZ IN SUPPORT OF FIRST DAY MOTIONS**

19         I, Pamela Martinez, hereby declare as follows:

20         1.      I am the President of Yellow Cab Cooperative, Inc., the debtor in possession

21 ("Yellow Cab" or the "Debtor") in the above-captioned Chapter 11 case (the "Chapter 11 Case").

22 I submit this declaration (the "Declaration") in support of the Debtor's Voluntary Petition and

23 "first day" motions, which are described further below (collectively, the "First Day Motions").

24 Except as otherwise indicated, all statements in this Declaration are based upon my personal

25 knowledge, my review of the Debtor's books and records, relevant documents and other

26 information prepared or collected by the Debtor's employees and consultants at my direction, or

27 _____

28 [1] The last four digits of the Debtor's tax identification number are 7102.  The location of the Debtor's headquarters and service address is 1200 Mississippi Street, San Francisco, CA 94107.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

my opinion based on my experience with the Debtor's operations and financial condition. and am competent to testify as to the matters set forth herein. In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees and consultants, I have relied upon these employees and consultants accurately recording, preparing, or collecting any such documentation and information. I am authorized to submit this Declaration on behalf of the Debtor.

2. This Declaration describes the Debtor's business and the developments that led to its filing for relief under chapter 11 of the Bankruptcy Code, and sets forth the relevant facts supporting certain of the First Day Motions filed concurrently herewith and incorporates by reference the facts of the other First Day Motions.

## I. THE DEBTOR'S BUSINESS AND EVENTS LEADING TO BANKRUPTCY FILING

### A. Overview of the Debtor's Business

3. Yellow Cab provides taxicab transportation services in the San Francisco, California area. In San Francisco, taxicab "color schemes" are licensed by the County of San Francisco to provide services to taxi medallion owners, which color schemes and medallion holders operate in a highly regulated environment. Yellow Cab is a non-profit cooperative service company (a structure further explained below) that provides an operating base for approximately 522 San Francisco taxi medallions (or permits), operating on a cooperative basis. Yellow Cab supports approximately 1,100 medallion owners and lessee drivers in their individual taxi operations, and separately employs approximately 90 persons to provide those support services. Yellow Cab currently supports approximately one-third of the total medallions operating in San Francisco. All material assets used in its business operations are either leased or subject to secured debt that equals or exceeds the value of those assets.

4. Yellow Cab is a "consumer cooperative," formed under California Corporations Code ("CorpC"), Sections 12200 et. seq. Outside of the agriculture world, housing cooperatives, and purchasing cooperatives (e.g., REI), I understand that a cooperative is a relatively rare corporate structure—and an active support operating cooperative such as Yellow Cab is

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 2 -

Case: 16-30063    Doc# 6    Filed: 01/22/16    Entered: 01/22/16 15:30:40    Page 2 of 26

1  extremely rare even among cooperatives as a whole.[2]

2       5.     Yellow Cab was structured as a cooperative, because cooperatives are a

3  fundamentally different type of company than the usual "for profit" corporation governed under

4  the General Corporation Law of Division 1 of the Corporations Code (CorpC §§ 100 *et seq.*) and

5  is a structure uniquely suited for Yellow Cab's purposes and goals of providing service and

6  support to the medallion owners operating under the Yellow Cab color scheme. Fundamentally—

7  unlike general for-profit corporations—by definition cooperatives do not exist for the profit

8  motive of either the corporation or members, as such, but exist for the benefit of its members in

9  their underlying personal or business contexts separate from the cooperative, where the

10  cooperative's "earnings…or benefits shall be used for the general welfare of the members

11  or…proportionally and equitably distributed to some or all of its members or its patrons, based on

12  their patronage" (CorpC § 12201), rather than based on their share ownership interests. Yellow

13  Cab operates based on the underlying premise applicable to operating cooperatives that the

14  patronage distributions are not distributions of corporate "profits"—as would be the case with

15  "for profit" corporations—but are simply a return to the patrons of "their money" as collected by

16  the cooperative on their behalf in providing the cooperative's support services.

17       **B.**     <u>Yellow Cab Services and Operations</u>

18       6.     Fundamentally, Yellow Cab is a non-profit service entity, which exists solely for

19  the purpose of facilitating the joint operation of taxicab permits issued by the County of San

20  Francisco, both those owned by Yellow Cab members and contracting non-member patrons and

21  affiliates. Among other things, services provided by Yellow Cab include: management;

22  accounting; uniform color scheme and dress; centralized order taking and dispatch for potential

23  passengers; credit card processing; vehicle dispatch into service for drivers; arrangement of lessee

24  drivers for shifts not driven by medallion owners; vehicle acquisition and maintenance; providing

25  taxi meters; backup vehicles for use when the primary medallion vehicle is inoperable; lost and

26  found depository; centralized parking (required by San Francisco); and regulatory compliance.

27  [2] Because of Yellow Cab's uniqueness, on formation a tax ruling was sought, and the Internal Revenue Service has

28  reviewed and approved Yellow Cab as a cooperative for tax purposes, issuing a private letter ruling confirming
Yellow Cab's cooperative tax treatment under Subchapter T of the Internal Revenue Code.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 3 -

7.     Yellow Cab has four relationships with medallion owners, two of which are on a direct patronage basis, one on an indirect patronage basis, and one on a contract service basis. There are currently approximately 522 medallions operating under the Yellow Cab color scheme, although this figure is subject to ongoing fluctuation. The majority of permit holders operating under the Yellow Cab color scheme are "members" (also referred to as "owners"). Approximately 281 medallions are held by members, and economically are on a direct patronage basis. Yellow Cab also services non-member medallions operated on a direct patronage basis, which medallion holders are called "full associates", of which there are approximately 27. The only difference between members and full associates is that the latter are not formally admitted as members and cannot vote on cooperative matters; economically they are identical. Yellow Cab also has approximately 76 medallions from "associates". Associates operate on an indirect patronage basis, and lease their medallions to Yellow Cab for a fixed lease amount. The lease rental rate varies over time, and is adjusted based on Yellow Cab's cost of operations. Yellow Cab has full responsibility for all operational aspects and costs of the medallions operated under the member, full associate, and associate contexts. Finally, there are 138 "affiliates", who simply pay a fee to operate under Yellow Cab's colors; essentially Yellow Cab provides dispatch services and the affiliate operates under Yellow Cab's color scheme, but otherwise the affiliate is responsible for all underlying operating costs and needs.

8.     All medallion holders, regardless of type of Yellow Cab relationship, have priority rights to drive their own medallions. Patronage drivers (members and full associates) are charged a "shift charge" for each shift driven, which charge represents an attempt by Yellow Cab to determine, and pass through, the particular costs of operating a taxi for that shift. Associates are paid the lease rental, but then are charged the full shift charge (referred to as "gates", which is the same amount paid by a lessee driver) for shifts driven. In light of the fact that a medallion holder can only drive so many hours (physically and by law), a component of the service provided by Yellow Cab is to fill all of the drivable shifts that are not otherwise being driven by the medallion owners, with lessee drivers. Lessees pay "gates," which are a fixed-dollar-per-shift amount that is set by the County of San Francisco (although companies can charge less).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 4 -

9. Regardless of the label of the Yellow Cab-medallion owner relationship, the underlying intent is to operate on a cost pass-through or allocated basis. Pursuant to its cooperative structure, Yellow Cab provides a mechanism for medallion owners to operate on a group basis in order to obtain the benefits of common management, common operations, and operation scale. However, unlike an ordinary corporation, Yellow Cab's basic economic goal is to operate on a nonprofit basis. The reasons for this including the following:

a. As a cooperative, net revenues (*i.e.*, . revenues derived from member patronage less expenses), are required to be distributed to its members as "patronage distributions" (aka "patronage dividends"), so that no "profit" is retained by Yellow Cab.

b. By law, taxi medallions are generally not transferable. In order to become a member the person must own a medallion, and in order to continue to share in patronage dividends, a member must continue to have a medallion being operated by the company. On death of a member, the member's medallion is canceled by the City of San Francisco, and the related Yellow Cab membership interest becomes "orphaned" without a medallion, and thereafter does not share in any patronage dividends. Thus, unlike as with shares in a for-profit corporation, any successor-in-interest to a Yellow Cab membership interest has no continuing claim to any patronage dividends.

c. Because there is no effective residual value obtainable from ownership of a membership interest, members accordingly have no economic incentive in the cooperative "building equity," such as through retention and reinvestment of earnings, nor is doing so feasible in view of current net revenues being distributed to members holding medallions as patronage dividends. In fact, any "equity" retained in the company (by non-distribution of the patronage earnings to medallion holders) would be effectively lost by the individual member at the time a medallion is moved out of the company (whether because of death or because the owner decides to change the place of operation of his medallion), as there is no market for membership interests, so, as a practical matter, the membership interest, and any underlying "equity" value, is essentially abandoned.

10. Importantly, <u>there is no contractual or other restriction that limits a medallion</u>

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS
- 5 -

Case: 16-30063   Doc# 6   Filed: 01/22/16   Entered: 01/22/16 15:30:40   Page 5 of 26

holder (whether member or otherwise) from changing "color scheme"--*i.e.*, moving a medallion's base of taxi operations to a different company, and all medallions serviced by Yellow are free to leave Yellow and go elsewhere at any time, subject only to a minimal amount of time necessary for obtaining approval of the County of San Francisco. Most medallion holders drive their own medallions (as required under San Francisco ordinance), and medallion holders regularly change color scheme. For example, if medallion holders do not receive effective support for their own taxi-driving operations, and patronage returns from off-shift operations of their taxi medallion (whether as a patronage dividend or lease rental payment), they will move their medallions to maximize such support and returns. If a critical mass of Yellow-operated permits change color scheme because of lack of reasonable patronage dividends or lease rental returns, then Yellow risks being unable to support its fixed overhead and other expenses.

**C.    Events Leading to the Chapter 11 Filing**

11.    In earlier days of its operation, Yellow Cab had material non-patronage income, the principal source of which was that it directly owned 25 corporate taxi permits for which Yellow Cab itself was the only "patron." Because of this large non-patronage income, Yellow Cab was able to build material equity in those early days. A byproduct of this economic strength was that Yellow Cab qualified for self-insurance under applicable California Vehicle Code statutes and Department of Motor Vehicle ("DMV") regulations. On a short term basis, the ability to self-insure resulted in lower operating costs. However, self-insurance exposed Yellow Cab to risks of catastrophic losses, which ultimately occurred, as discussed below. During this early time period, Yellow Cab had essentially no debt, and was able to purchase its vehicles with cash.

12.    Yellow Cab subsequently lost its corporate medallions (which were canceled by San Francisco County as a result of regulatory changes). This resulted in the loss of the associated income, and ultimately lead to Yellow Cab needing to incur debt to operate its business, including acquiring all vehicles through debt financing, and Yellow Cab was forced to use its accumulated equity to pay tort claims (in view of its self-insured status).

13.    In 2006, Yellow Cab was required to pay $14,500,000 in a single loss as a result of

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 6 -

a major injury accident claim (in addition to the large number of smaller losses that occur every year). While a small portion of this obligation was covered by separate insurance of the driver, since Yellow Cab was self-insured, it directly paid the vast bulk of the claim, using funds borrowed from First Republic Bank ("FRB") by pledging a security interest in its then major unencumbered asset--the real property where it conducted its operations, located at 1200 Mississippi Street, San Francisco (the "Mississippi Street Property").[3]

14.     Even after the 2006 payment, Yellow Cab continued to qualify for self-insurance. However, by 2015, the combination of continued uninsured losses and increasing cumulative tort payment obligations, and the struggles arising from dramatic change of the operating environment and loss of drivers (and thus revenue) caused by competition from ride-sharing services (such as Uber and Lyft), drained Yellow Cab's remaining equity. In early 2015, with Yellow Cab's book value essentially wiped out, the DMV revoked Yellow Cab's self-insurance certificate, as it lacked the required minimum book value to qualify for self-insurance. Yellow Cab subsequently obtained commercial insurance, at a current cost of more than $500,000 monthly.

15.     While Yellow Cab has the ability to continue its service functions for its patrons as a cooperative, and to meet its operating liabilities, including its commercial liability coverage, there are material tort liabilities, and tort liability exposure, that were incurred and arose during the period in which Yellow Cab was self-insured, for which it lacks the resources to pay. These include: (i) payments aggregating approximately $1.3 million with respective to settlements of prior tort claims; (ii) two judgments totaling approximately $9 million entered against Yellow Cab in the fourth quarter of 2015 (by plaintiff *Fua* in amount of $8.1 million plus accrued interest, and plaintiff *Oliverio*, in the amount of $861,250 plus accrued interest); (iii) some 150 open claims aggregating approximately $10 million.

16.     Accordingly, Yellow Cab commenced this Chapter 11 Case in an attempt to restructure its (primarily tort-related) debts, particularly in view of the judgment enforcement efforts undertaken or threatened by tort creditors. *E.g.*, in the face of judgment creditor *Fua's*

---

[3] Pursuant to a 2007 transaction, the Mississippi Street Property was transferred to Taxi Property Company, LLC ("TPC"), which assumed the related debt obligation owed to FRB plus agreed to pay Yellow Cab an additional $3,000,000, with Yellow Cab leasing the Mississippi Street Property from TPC.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 7 -

enforcement efforts, the San Francisco Superior Court stayed enforcement of her $8.1 million judgment until January 25, 2016; judgment creditor Oliverio obtained an abstract of judgment in the amount of $861,250 against Yellow Cab on November 19, 2015; judgment creditor *Sumi Lim* obtained an Abstract of Judgment on January 8, 2016 in the amount of $527,215 for purposes of lien recording based on Yellow Cab's cessation of payments pursuant to the parties' settlement.

## II.   FIRST DAY MOTIONS

### A.   INTRODUCTION

17.   In order to enable the Debtor to minimize the adverse effects of the commencement of this case, the Debtor has requested various types of relief in the First Day Motions.

18.   I have reviewed each of these First Day Motions (including the exhibits thereto), and I incorporate by reference the factual statements set forth in the First Day Motions.[4]  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions is: (a) necessary to enable the Debtor to operate under Chapter 11 with minimal disruption to its current business operations; and (b) essential to maximizing the value of the Debtor's assets for the benefit of its estate and creditors.

19.   It is my further belief that, with respect to those First Day Motions requesting the authority to pay prepetition claims or to continue selected prepetition programs (*e.g.*, those First Day Motions seeking relief related to the Debtor's obligations to its employees, independent contractors, passengers, creditors and certain taxing authorities), the relief requested is essential to the Debtor's efforts to preserve and maximize value in this cases and avoid immediate and irreparable harm to the Debtor and its estate.

20. I believe that any denial or diminution in the relief requested in the First Day Motions could have an immediate and irreparably harmful impact upon the going concern value of the estate, to the detriment of all of the Debtor's stakeholder constituencies. The Debtor believes that payment of the prepetition claims identified in the First Day Motions will forestall such

---

[4] Capitalized terms not defined herein shall have the meaning ascribed to them in the First Day Motions.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 8 -

irreparable harm and that all the Debtor's creditors will ultimately benefit from the relief requested therein.

**B. MOTION TO APPROVE STIPULATION WITH FIRST REPUBLIC BANK FOR USE OF CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION PURSUANT TO STIPULATION**

21. First Republic Bank ("FRB" or "Lender") is the Debtor's primary secured creditor, pursuant to an August 31, 2012 Loan Agreement between the parties. As of the Petition Date, the principal balance owed by the Debtor under the Loan Agreement is approximately $93,863.83, with interest accruing at 5.25% per annum, which loan matures on May 31, 2016. Pursuant to the Loan Agreement and related documents (collectively, the "Loan Documents") (copies attached as Exhibit 1 to First Day Motion re Cash Collateral), FRB has a perfected first-priority security interest in virtually all of the Debtor's assets, including its "cash collateral" as such term is defined in Bankruptcy Code Section 363.

22. The Debtor has entered into the Stipulation for Use of Cash Collateral (the "Stipulation") with FRB (copy attached as Exhibit 2 to First Day Motion re Cash Collateral), subject to Court approval, to permit the Debtor to use cash collateral in the ordinary course of business during this Chapter 11 Case, subject to the operating budget and cash flow forecast (the "Budget") attached as Exhibit "A" thereto, and other specified requirements.[5] Pursuant to the related First Day Motion, the Debtor seeks approval of the Stipulation and authority to use cash collateral pursuant to Bankruptcy Code Section 363(c) and the related adequate protection to be provided to FRB.

23. Pursuant to the Stipulation, cash collateral is to be used in the ordinary course for operations of the business of the Debtor, so long as monthly adequate protection payments (as specified below) are made to Lender. Use of cash collateral may continue until the earlier of: the effective date of a Chapter 11 plan of reorganization confirmed in the Case, the dismissal of the Case or conversion of the Case to Chapter 7 of the Bankruptcy Code.

24. The Stipulation provides for the Lender to receive monthly adequate protection

---

[5] The Stipulation allows for slight deviations in the Budget, as long as expenditures do not exceed 115% of the budgeted amount on a line item basis, or 110% on an aggregate basis.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 9 -

payments equal to the regular debt service payments owed by the Debtor under the Loan

Documents in the amount of approximately $28,500 per month, along with payment of certain fees

and expenses, and a replacement lien on Collateral to the extent of diminution in value of

prepetition Collateral, with a back-up super-priority claim pursuant to Bankruptcy Code Sections

503(b) & 507(b) as measured by a decline in the value of Lender's Collateral as of the Petition

Date. The replacement lien attaches only to the collateral of the kind and character to which

Lender's liens would have attached pre-petition (and not to claims or causes of action possessed by

Debtor's bankruptcy estate under Sections 506(c), 544, 545, 547, 548, 549, 553(b), or 723 and 724

or the proceeds therefrom), and is subordinate to Carve-Out Expenses (including the compensation

and expenses (excluding professional fees), of any subsequently-appointed trustee in the

bankruptcy case, and certain unpaid professional fees and disbursements incurred by the Debtor

and the Committee).

**C. MOTION TO: (I) CONTINUE PRE-PETITION CASH MANAGEMENT SYSTEMS; (II) MAINTAIN CREDIT CARD MERCHANT PAYMENT SYSTEM; AND (III) MAINTAIN BUSINESS FORMS**

**The Cash Management System**

25. In the ordinary course of business, the Debtor maintains an integrated cash-management system that provides well-established processes for the collection, concentration, management, monitoring, and disbursement of funds generated and used in its operations (the "Cash Management System").

26. The Cash Management System enables the Debtor to effectively manage and monitor the inflow of receipts from (independent contractor) drivers and various other sources, and the outflow of disbursements to drivers, creditors and others. The Debtor relies on a third party provider, Yellow Card Services ("YCS"), to process credit and debit card payments and remit to drivers within 24 hours the net receipts collected on their behalf after deducting related processing expenses. I am informed and believe that it is critical that the Cash Management System remains intact to ensure seamless passenger experiences and continued collection of revenues for the Debtor's estate.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 10 -

27.     The Cash Management System consists of seven bank accounts (collectively, the "Bank Accounts") maintained with First Republic Bank ("FRB"), comprised of the following:

(a) General Account ("GA"), Account No. XXXX17292, where cash is generally concentrated, and is used (in conjunction with other Bank Accounts) for incoming daily receipts, and to make certain electronic and other disbursements in the ordinary course of the Debtor's business, including payroll funding and payments to creditors;

(b) Merchant Account, Account No. XXXX26293, which receives deposits (including cash, ACH payments, credit and debit cards) from vendors, corporate customers and shop sales, and other non-driver parties, which are used to fund the GA;

(c) Prepaid Account, Account No. XXXX92017, which is used to receive drivers' credit card and debit card payments processed by YCS, and pay the net amounts (after deducting leasing and other operational expenses owed to the Debtor) to drivers;

(d) Accident Account, Account No. XXXX36966, which is used to pay accident claims to claimants and North American Risk Services & Frye Claims Consultation (claims administrators), and is funded from the GA;

(e) Workers' Compensation Account, Account No. XXXX98809, which is used for funding and paying the Debtor's workers' compensation claims and York Risk Services (claims administrator);

(f) Owners Account, Account No. XXXX26186, which is used to pay patronage dividends, funded from the GA (although no such payments have been made since September 15, 2015); and

(g) Health Savings Account, Account No. XXXX8569, for funding of employee health care expenses, as required by the City and County of San Francisco.

28.     As noted above, virtually all collections and disbursements in the course of the Debtor's business are made through the GA. This includes funding of payroll, medallion rental and real estate leasing expenses, as well as automatic ACH payments to the Debtor's primary secured creditors—FRB, Ford Motor Credit Corporation and First National Bank of California.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 11 -

Case: 16-30063    Doc# 6    Filed: 01/22/16    Entered: 01/22/16 15:30:40    Page 11 of 26

29. The Debtor maintains detailed and accurate records of all disbursements and transfers flowing in connection with its Cash Management System, including all checks, electronic payments and debit and credit card payments. Annual audits are conducted with respect to the Debtor's Cash Management System.

30. Cash management systems are complicated and require skill and training in their use and administration. I am informed and believe that maintaining the Cash Management System in its current state is crucial to the Debtor's operations in light of the significant volume of transactions managed through the Cash Management System every day. The Debtor is familiar with the Cash Management System which enables it to collect, disburse, reconcile, control and monitor its accounts in a seamless, expedient fashion. Any disruption to the Cash Management System would unnecessarily disrupt the Debtor's complex day-to-day operations and thereby likely cause unnecessary harm to the estate.

**Credit Card Merchant Payment System**

31. Many of the passengers in the Debtor's taxicabs pay for their purchases with various credit and debit cards, consistent with other taxicab services in San Francisco. Turning away unsuspecting passengers who are unable to pay with cash would not only result in the direct loss of those sales, but could also upset drivers and passengers, thereby damaging goodwill. More importantly, San Francisco Municipal Transit Authority's ("SFMTA") Rules and Regulations, Section 1124, Part D, requires that drivers accept credit cards as well as cash for cab service. Consequently, I am informed and believe that any interruption with the Debtor's ability to accept and process credit and debit card transactions, even for a minimal time, would result in lost sales and diminished goodwill, as well as risking fines and/or revocation of medallions by the SFMTA.

32. As noted above, the Debtor has an agreement with YCS (in accordance with requirements established by the SFMTA) pursuant to which it maintains a system (the "Credit Card Merchant Payment System") that facilitates payments by passengers with credit and debit cards. In accordance with that agreement, credit and debit card transactions are processed by

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 12 -

Case: 16-30063    Doc# 6    Filed: 01/22/16    Entered: 01/22/16 15:30:40    Page 12 of 26

YCS, who submits the appropriate funds (after deducting applicable fees and charges) which are then deposited in the Debtor's Prepaid Account.

33.     Approximately 80% of the Debtor's aggregate monthly sales transactions are made via credit or debit cards. The Credit Card Merchant Payment System is critical to the Debtor's ongoing business.  The Debtor might be unable to find alternative merchant services similar to those provided by YCS, and any loss of services from YCS would cause a deleterious lapse in the Debtor's ability to accept credit and debit card payments.

34.     The fees collected by YCS are *de minimis* in relation to the value the Credit Card Merchant Payment System brings to the Debtor's overall ability to collect and process credit and debit card payments.  I am informed and believe that maintaining the relationship with YCS is essential for the Debtor to facilitate service to its passengers, while YCS does not have any significant risk of loss by continuing its services, as its costs and processing fees are deducted from funds received for each transaction.

### Use of Business Forms.

35.     As part of the Debtor's ordinary business, including the complex cash management and credit-card merchant programs described above, the Debtor uses a range of business forms, including letterheads, purchase orders, invoices, and checks (collectively, the "Business Forms"), without reference to its debtor-in-possession status.  Creditors and vendors doing business with the Debtor presumably will be aware, pursuant to the notice of the case commencement that will be disseminated in this case, in addition to the anticipated press release to be issued by the Debtor, that the Debtor has filed bankruptcy.

36.     I am informed and believe that the Debtor must protect and preserve the goodwill with its passengers and vendors by maintaining the use of the current Business Forms.  In addition, the Debtor already possesses a stock supply of Business Forms which do not state that it is a debtor-in-possession.  Revising the Debtor's existing Business Forms would create an unnecessary and expensive burden to the estate.  Moreover, I am informed and believe that the time and expense for such revisions would be disruptive to the Debtor's business operations and would not confer any benefit on those dealing with the company.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 13 -

**D.**     **MOTION FOR ORDER: (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE; (II) DEEMING UTILITIES ADEQUATELY ASSURED OF PAYMENT; AND (III) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE OF PAYMENT**

37.     In connection with the operation of its business, the Debtor obtains electricity, gas, telephone, internet, garbage collection and similar services (collective, the "Utility Services") from various different utility companies and telecommunication vendors (collectively, the "Utility Companies"). Attached as Exhibit 1 to the First Day Motion re Continued Utility Service is a list of all of the Utility Companies that provide Utility Services to the Debtor as of the Petition Date.

38.     If the Utility Companies are permitted to terminate Utility Services on or after the 30th day following the Petition Date, I am informed and believe that there is a risk that the Debtor would be forced to cease operation of its facilities, resulting in a substantial loss of revenues that will irreparably harm the Debtor's business. I am informed and believe that cessation of key utility services would directly impact the Debtor's ability to provide services to its customers, and would jeopardize the Debtor's restructuring efforts. Thus, in my opinion, it is critical that Utility Services continue uninterrupted.

39.     The Debtor has an excellent record prior to filing its petition in this case of prompt and regular payment for Utility Services rendered by the Utility Companies, and the Debtor is unaware of any defaults or arrearages with respect to Utility Services, other than payment interruptions caused by the preparation for and filing of Debtor's bankruptcy petition.

40.     I am informed and believe that the Debtor has sufficient cash resources to meet its post-petition obligations in the ordinary course of business, including payments to the Utility Companies as they become due.[6]

41.     As set forth in the First Day Motion re Continued Utility Service, the Debtor proposes to furnish any Utility Company, upon written request, a cash deposit in an amount equal to one (1) month's utility payment, based on historical averages during the six month period immediately preceding the Petition Date (each, an "Adequate Assurance Deposit") to the

---

[6] As discussed above, the Debtor's First Day Motion for use of cash collateral includes a budget and cash flow forecast reflecting ongoing payment of operating expenses, including for utility services.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

requesting Utility Company as reflected on Exhibit 1 to the Motion.

42.    I am informed and believe that the Debtor's record of prompt payment for Utility Services prior to the Petition Date, its ability to make future payments for Utility Services in the ordinary course of business as they come due, and its offer to make Adequate Assurance Deposits upon written request by any Utility Company provide and constitute sufficient adequate assurance to the Utility Companies.

43.    If, however, any Utility Company believes additional assurance is required, it may request such additional adequate assurance pursuant to the Adequate Assurance Procedures set forth in the First Day Motion re Continued Utility Service.  .

**E.    MOTION OF THE DEBTOR FOR AUTHORITY TO (I) PAY PREPETITION PERSONNEL WAGES, SALARIES, AND OTHER COMPENSATION; (II) REIMBURSE PREPETITION PERSONNEL BUSINESS EXPENSES; (III) MAKE PAYMENTS FOR WHICH PREPETITION PAYROLL DEDUCTIONS WERE MADE; (IV) CONTRIBUTE TO PREPETITION PERSONNEL BENEFIT PROGRAMS AND CONTINUE SUCH PROGRAMS IN THE ORDINARY COURSE OF BUSINESS; (V) PAY WORKERS' COMPENSATION OBLIGATIONS; AND (VI) PAY ALL COSTS AND EXPENSES INCIDENT TO THE FOREGOING PAYMENTS AND CONTRIBUTIONS**

**Prepetition Personnel Obligations**

**Wages, Salaries, and Other Compensation**

44.    Of the Debtor's approximately 90 Personnel, approximately 80 are hourly Personnel and 10 are salaried Personnel. In addition, the Debtor also retains the services of approximately 1,100 independent contractors (the "Independent Contractors"), individuals who provide their services to the Debtor for limited engagements, generally driving taxicabs with the Debtor's "flags" (*i.e.*, "Yellow Cabs.")  The Debtor's average aggregate monthly compensation to Personnel for wages and salaries ("Personnel Wages") is approximately $310,000, exclusive of the deductions and exclusions detailed below.  The Debtor's payroll is funded through direct deposit and paper check.  The Debtor's hourly and salaried Personnel are each paid on a weekly schedule, with payments on Wednesday for services provided during the prior week (12:00am Sunday through 11:59pm Saturday).   The Debtor typically pays Independent Contractors the fares collected on their behalf as service provider within 24 hours after their driving shift.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 15 -

Case: 16-30063   Doc# 6   Filed: 01/22/16   Entered: 01/22/16 15:30:40   Page 15 of 26

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

45.     Payroll for Personnel is paid from the Debtor's account with FRB, which is funded two days before the Personnel are paid.

46.     Due to the timing of this Chapter 11 Case, some Personnel have not received compensation for time worked prior to the Petition Date. Moreover, some payroll checks issued to Personnel prior to the Petition Date may not have been presented for payment or cleared the banking system prior to the Petition Date and, accordingly, may not have been honored and paid as of the Petition Date.[7]

47.     The Debtor estimates that the aggregate amount of accrued prepetition wages, salaries, and other cash compensation that remains unpaid to the Personnel as of the Petition Date is approximately $72,000 (the "Unpaid Personnel Compensation"). The Debtor believes that no Personnel is individually owed more than $11,725, which I understand is the priority amount for prepetition compensation under Section 507(a)(4) of the Bankruptcy Code (the "Prepetition Compensation Cap").

**Reimbursement of Prepetition Personnel Business Expenses**

48.     In the ordinary course of business the Debtor reimburses Personnel for certain expenses incurred in the scope of their employment on the Debtor's behalf (the "Reimbursable Expenses"). Personnel must request reimbursement within 30 days of incurring expenses, and the Debtor generally reimburses the Reimbursable Expenses of Personnel within five days after verifying the receipts for such expenses. The Debtor estimates that, as of the Petition Date, approximately $1,000 of Reimbursable Expenses will be unpaid.[8]

**Prepetition Deductions and Withholdings**

49.     During each applicable pay period, the Debtor routinely deducts certain amounts from the paychecks of Personnel (collectively, the "Deductions"), including, without limitation: (i) garnishments for child support and similar deductions required by law; (ii) contributions to health and dental plans, (iii) union dues, and (iv) contributions to 401(k) and certain other benefit plans

---

[7] Additionally, some discrepancies may exist between the amounts actually paid and amounts Personnel believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Personnel.
[8] There is no practical way for the Debtor to determine the actual amount of prepetition Reimbursable Expenses. A Reimbursable Expense is paid by the Debtor only after Personnel submits appropriate paperwork for reimbursement.

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 16 -

and other miscellaneous deductions discussed herein. The Deductions total approximately $24,372 in the aggregate per month.

50.     The Debtor also is required by law to (i) withhold from Personnel's wages amounts related to, among other things, federal, state, and local income taxes, social security, and Medicare taxes, (collectively, the "Withheld Amounts") for remittance to the appropriate taxing authorities and (ii) make correlated payments for social security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").  In the aggregate, the Debtor withholds and pays approximately $79,762 per month on account of Payroll Taxes.

51.     The Debtor estimates that, as of the Petition Date, approximately $18,500 in Deductions and Payroll Taxes (collectively, "Withholding Obligations") are outstanding with respect to Unpaid Personnel Compensation.

### Independent Contractors

52.     The Debtor estimates that, as of the Petition Date, approximately $50,000 attributable to pre-petition services remains outstanding to the Independent Contractors (the "Unpaid Contractor Obligations" and together with the Unpaid Personnel Compensation, the Deductions, and the Payroll Taxes, the "Unpaid Compensation").[9]  The Debtor believes that no Independent Contractor is individually owed more than the Prepetition Compensation Cap.

### Prepetition Personnel Benefits

53.     The Debtor also offers or provides eligible Personnel (and their dependents) with a variety of benefits.  These benefits include, but are not limited to: (i) healthcare, dental, and other related coverage; (ii) certain vacation and sick leave benefits; (iii) pension and 401(k) plans in which eligible Personnel can participate; (iv) COBRA medical coverage; and (v) other miscellaneous benefits described in greater detail below (all such benefits described in this Section E, collectively, the "Personnel Benefits").  The Debtor believes that as of the Petition

---

[9] This amount represents the net receipts collected on behalf of the Independent Contractors, after deducting associated amounts owed to the Debtor (e.g., related leasing and other operational expenses).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 17 -

Case: 16-30063    Doc# 6    Filed: 01/22/16    Entered: 01/22/16 15:30:40    Page 17 of 26

Date, the total amount owed or accrued in connection with the Personnel Benefits due to Personnel is approximately $161,488 for an average of approximately $1,794 per person.[10]

**Medical Dental, and Other Plans**

54.     The Debtor offer coverage to eligible Personnel (and their dependents) for medical, dental and other related benefits (collectively, the "Health Care Benefits").

55.     The Debtor's medical plan providers are Bay Area Automotive Group Welfare Fund ("BAAGWF"), Automotive Industries Trust Funds ("AITF"), Chinese Community Health Plan ("CCHP") and Kaiser Permanente ("Kaiser"). There are 51 Personnel currently enrolled in the Medical Plans, 9 with BAAGWF (for union Personnel), 25 with AITF (for union Personnel), 6 with CCHP (for non-union Personnel) and 11 with Kaiser (for non-union Personnel).

56.     The Debtor generally pays 100% of the Medical Plan costs for union Personnel, and 80% of the Medical Plan costs for non-union Personnel, by making a monthly transfer of approximately $54,843. The Debtor estimates that the aggregate amount due and owing on account of the Medical Plans as of the Petition Date is approximately $33,539.

57.     The Debtor offers to eligible Personnel who select certain Medical Plans the ability to contribute to a Health Savings Account ("HSA"). An HSA is a tax-advantaged personal savings account that works in conjunction with a high-deductible health plan, as it allows participants to contribute funds on a pre-tax or tax-deductible basis, which a participant may use to pay for eligible medical expenses. Participants may contribute up to $3,350 for individuals and $6,750 for families per year. Although no Personnel are currently utilizing an HSA, the Debtor is holding approximately $4,439 in HSA funds from prior employee deductions. The Debtor's HSA program is administered by Stratton Agency. The Debtor estimates that the aggregate amount due and owing on account of the HSA program as of the Petition Date is approximately $0.

58.     The Debtor's dental plan for Personnel (the "Dental Plan") is provided by Metlife Group Benefits. There are approximately 3 Personnel currently enrolled in the Dental Plan. The monthly cost of the Dental Plan is approximately $1,103, with the Debtor paying $0 and Personnel paying $1,103. As of the Petition Date, the Debtor estimates that the aggregate amount

---

[10] This estimate excludes any accrued but unused vacation time, sick days, or personal days.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 18 -

due and owing on account of the Dental Plan as of the Petition Date is approximately $0.

**Paid Time Off Benefits**

59.     The Debtor provide Personnel with vacation and sick leave benefits (collectively the "PTO Benefits"), which accrue in accordance with the below chart:

| YEARS OF ELIGIBLE SERVICE | PTO HOURS PER YEAR | MAXIMUM ACCRUAL |
|---|---|---|
| 1st year | 40 | 40 |
| 2nd-4th year | 80 | 120 |
| 5th + years | 120 | 180 |
| 15th + years | 160 | 240 |

In addition, pursuant to San Francisco law, Personnel accrue one hour of sick time for each 30 hours worked, up to a maximum accrual of 72 hours.

60.     Personnel are not entitled to a cash payout for accrued and unused PTO Benefits unless their employment terminates.

**Pension and 401(k) Plans**

61.     The Debtor's pension plans (collectively, the "Pension Plans") are maintained for the benefit of eligible union Personnel after completion of 90 days of service. The Debtor funds contributions to the Pension Plans aggregating approximately $8,823 per month. As of the Petition Date, approximately 34 Personnel participate in the Pension Plans. The Pension Plans are held in custody and administered by Western Conference of Teamsters Pension Trust Funds and AITF on behalf of the Debtor. The Debtor pays administrative/investment advisory fees of approximately $5,986 per month with respect to the Pension Plans. The Debtor estimates that the aggregate amount due and owing on account of the Pension Plans as of the Petition Date is approximately $8,823.

62.     The Debtor maintains two 401(k) plans (the "401(k) Plans") for the benefit of eligible Personnel after completion of one year of service, which generally allow participants to make automatic pre-tax salary deductions of eligible compensation up to the limits set by the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 19 -

Case: 16-30063    Doc# 6    Filed: 01/22/16    Entered: 01/22/16 15:30:40    Page 19 of 26

Internal Revenue Code: (i) a 401(k) Plan for union Personnel held in custody and administered by California Machinists on behalf of the Debtor, as to which the Debtor makes matching contributions (which amount to approximately $5,477 per month); and (ii) a 401(k) Plan for non-union Personnel held in custody and administered by Wespac on behalf of the Debtor, as to which the Debtor does not make matching contributions. As of the Petition Date, approximately 53 Personnel participate in the 401(k) Plans, including 34 in the California Machinists 401(k) Plan and 19 in the Wespac 401(k) Plan. Deductions from each participating Personnel's salary are transferred by wire to California Machinists and Wespac on a monthly basis to be credited to such Personnel's 401(k) accounts. The Debtor estimates that the accrued amount of its matching contribution to be funded to California Machinists totals approximately $1,838 as of the Petition Date.

### COBRA Coverage

63.     Former Personnel are entitled to continue to participate in the Debtor's Health Care Benefits pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 (as amended, "COBRA") for up to 18 months (such coverage, the "COBRA Coverage"). As of the Petition Date, the Debtor estimates that approximately 2 former Personnel are either currently on or eligible to elect COBRA Coverage. Former Personnel who elect to exercise their rights under COBRA must pay 102% of the premiums for COBRA Coverage. Kaiser administers the Debtor's COBRA enrollment. The Debtor estimates that, as of the Petition Date, it owed approximately $0 for COBRA coverage.

64.     I am informed and believe that failure to comply with the requirements of COBRA can subject the Debtor to penalties of up to $110 per day per qualified beneficiary (with a minimum penalty of $15,000 for more than *de minimis* violations), actions by the Department of Labor, and civil lawsuits by former Personnel to recover their benefits. *See, e.g.,* 29 C.F.R. § 2575.502c-6.

### Long Term Disability Insurance Coverage

65.     The Debtor provide long-term disability coverage (the "Disability Coverage") to eligible salaried Personnel through Metropolitan Life Insurance Company ("MetLife"). The

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 20 -

Debtor covers the full cost of the Disability Coverage by making monthly premium payments of approximately $288 to MetLife. Approximately 10 Personnel receive Disability Coverage. As of the Petition Date, the Debtor estimates it owes approximately $288 in unpaid amounts to MetLife related to Disability Coverage.

### Workers Compensation Coverage

66.    In accordance with California law, the Debtor maintain a workers' compensation program to provide their Personnel with compensation for injuries arising from or related to their employment with the Debtor (the "Workers' Compensation Program"). The Debtor's Worker's Compensation Program is self-insured, with the Debtor depositing approximately $50,000 to $60,000 monthly into a segregated account for such purpose. As of the Petition Date, the Debtor estimates it currently owes approximately $117,000 on outstanding Workers' Compensation Program claims, based on funding requests from the Workers' Compensation Program administrator.

### Third Party Administrative Costs

67.    As is customary in the case of most large companies, in the ordinary course of business the Debtor utilizes the services of numerous third-party administrators to whom the Debtor outsources tasks associated with the payment of compensation and benefits to Personnel. Those administrative services include (a) administering or assisting in the administration of the Debtor's payroll processes, benefit plans, and workers' compensation obligations; (b) facilitating the administration and maintenance of its books and records; (c) assisting with legal compliance issues; and (d) conducting special administrative and legal compliance projects in respect of Personnel benefit plans and programs (the costs associated therewith, the "Third-Party Administrative Costs," and together with the Reimbursable Expenses, Unpaid Compensation and the Personnel Benefits, the "Personnel Wages and Benefits"). The ordinary course services provided by these third-parties ensure that the Debtor's obligations with respect to Personnel continue to be administered in the most cost-efficient manner and comply with all applicable laws.

68.    The Debtor's workforce is in many ways one of its key assets--but it is one that

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 21 -

Case: 16-30063   Doc# 6   Filed: 01/22/16   Entered: 01/22/16 15:30:40   Page 21 of 26

can walk out the door any day with no obligation to return. I am informed and believe that keeping the Debtor's workforce intact is crucial to preserving the Debtor's going concern value. I am informed and believe that it is essential that the Debtor continue to honor its Personnel Wages and Benefits obligations to ensure the continued operation of the Debtor's business and to maintain the morale of the Personnel and Independent Contractors. Absent the requested relief, many Personnel and Independent Contractors may be unable to meet personal obligations, or may seek alternative employment opportunities, perhaps with the Debtor's competitors (particularly Independent Contractors who can alternatively provide services to ride sharing companies such as Uber and Lyft). An material depletion of the Debtor's workforce would hinder its ability to provide service to clients and diminish the Debtor's prospects for a successful reorganization.

**F.     MOTION FOR ORDER AUTHORIZING DEBTOR TO CONTINUE PRE-PETITION AFFILIATE (DRIVER) DEPOSIT PRACTICES**

69.     Yellow Cab holds certain "Vehicle for Hire Permits" issued by the San Francisco Municipal Transportation Agency ("SFMTA"), which authorize the operation of motor vehicles for hire on the public streets of San Francisco. Yellow Cab also possesses a taxicab "color scheme" approved by the SFMTA and is authorized to operate a taxicab radio dispatch service in the City and County of San Francisco.

70.     Pursuant to the Color Scheme Affiliation Agreement between Yellow Cab and each of its affiliate drivers (collectively, "Operators") of taxicabs with the Debtor's "color scheme" (the "Affiliation Agreement") (copy attached as Exhibit 1 to the First Day Motion re Affiliate (Driver) Deposit Practices), the Operators are authorized to use their respective vehicles under Yellow Cab's color scheme pursuant to specified terms and conditions.

71.     The Affiliation Agreements require Yellow Cab to provide certain equipment (collectively, the "Equipment") for the Operators' use, subject to a $2,000 security deposit provided by each Operator (collectively, the "Security Deposits"). Specifically, Section C.2. of the Affiliation Agreement states: "Operator shall pay to Yellow Cab a security deposit in the amount of $2,000.00 for each communications link (which includes a radio, meter, mobile data terminal or other devices provided by company) provided pursuant to this Agreement and any

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 22 -

Case: 16-30063    Doc# 6    Filed: 01/22/16    Entered: 01/22/16 15:30:40    Page 22 of 26

other charges accrued pursuant to this Agreement." Section C.3. provides: "Operator agrees to pay all costs and other charges for any damage or repair to the communications link equipment installed in the Vehicle(s) pursuant to this Agreement, reasonable wear and tear accepted."

72. Section D.4 of the Affiliation Agreement provides for the Operators to return the Equipment upon termination ("On termination of this Agreement for any reason, Operator shall immediately return or otherwise arrange for the return of any and all leased taxicab Medallions and any equipment supplied by Yellow Cab including but not limited to Vehicle(s) pursuant to this Agreement"), with the Security Deposit, less the applicable cost of any missing or damaged Equipment, returned to the Operator.

73. As of the Petition Date, the Debtor was accountable for Security Deposits aggregating approximately $290,000. Historically, the monthly deposits collected by and returned by the Debtor have each recently averaged approximately $2,000 monthly. Such funds are deposited (on a non-segregated basis) in and disbursed from the Debtor's general operating account with First Republic Bank (Account Number XXXX17292).

74. Drivers of taxicabs with the Debtor's color scheme also are in many ways one of the Debtor's key assets--but one that also can "walk out the door" any day with no obligation to return. I am informed and believe that keeping the force of Operators intact is crucial to preserving the Debtor's going concern value. However, absent the requested relief, many current or prospective Operators may seek alternative employment opportunities, perhaps with the Debtor's competitors (e.g., by providing services to ride sharing companies such as Uber and Lyft). I am informed and believe that it is thus essential that the Debtor continue to honor its Deposit Practices to ensure the continued operation of the Debtor's business.

75. I am informed and believe that Operators are generally not familiar with the effects of a bankruptcy filing, and might fear that the Debtor's continued operations are in jeopardy. This fear would be compounded if the Debtor did not return Operators' Security Deposits (after deducting costs of lost or damaged Equipment) upon termination, on the legally technical grounds that these constitute prepetition liabilities that may only be addressed by the filing of proofs of claim in the Chapter 11 Case. Further, fearing that their Security Deposits will not be returned

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

due to the Debtor's financial difficulties, some Operators have withheld payments owed to the Debtor, thereby depriving the estate of critical revenue.

76.     Moreover, if the Debtor failed to fully and timely comply with its Deposit Practices, then prospective Operators may be reluctant to do business with the Debtor.  Even though I understand that the Debtor's ability to perform postpetition obligations of this type would not be restricted or prohibited by its bankruptcy filing, prospective Operators may interpret the Debtor's failure to honor its Deposit Practices pursuant to prepetition Affiliation Agreements as an indication that the Debtor's postpetition performance is also at risk, thereby deterring them from becoming Operators.

77.     Therefore, I am informed and believe that the Operators must be reassured that the Debtor will honor its Deposit Practices under the Affiliation Agreements, as any depletion of the Debtor's stable of Operators would hinder its ability to provide service to clients and diminish its prospects for a successful reorganization.

### G.     MOTION FOR ORDER AUTHORIZING DEBTOR TO REMIT AND PAY CERTAIN PREPETITION TAXES

78.     In the ordinary course of business, the Debtor incurs a variety of taxes and fees payable to various federal, state, and local government authorities and other parties  (collectively, the "Governmental Authorities").  In the ordinary course of its business, taxes are remitted by the Debtor through checks and electronic transfers that are processed through its bank and other financial institutions (collectively, the "Banks").  The taxes and fees (collectively, the "Taxes") include: (a) sales and use taxes paid to the California State Board of Equalization, primarily in connection with the sale of auto parts (the "Sales Taxes"); (b) payroll taxes paid to the County of San Francisco (the "Payroll Taxes"); (c) parking taxes paid to the City of San Francisco (the "Parking Taxes"); (d) annual airport inspection fees paid to San Francisco Airport Inspection (the "Airport Fees"); (e) vehicle registration fees paid to the California Department of Motor Vehicles ("DMV Fees") and (f) annual device fees paid to the City and County of San Francisco Department of Public Health with respect to taxi meters in each cab (the "Device Fees").  In the aggregate, the Debtor estimates that approximately $141,321 in Taxes is owed for the period prior

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 24 -

Case: 16-30063     Doc# 6     Filed: 01/22/16     Entered: 01/22/16 15:30:40     Page 24 of 26

to the Petition Date as follows:

Sales Taxes:    $3,500.00

Payroll Taxes:    $11,000

Parking Taxes:    $2,500

Airport Fees:    $16,000

DMV Fees:    $36,024

Device Fees:    $72,297

Total:        $141,321

79.    I am informed and believe that the Debtor needs to pay the Taxes in order to preserve and sustain its ongoing business operations. The failure to pay certain of the Taxes may adversely affect the Debtor's ability to maintain its good standing to operate in the jurisdiction in which it does business, to conduct business in that jurisdiction, and to administer its estate for the benefit of its creditors. I am informed and believe that any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business could have a wide-ranging and adverse effect on the Debtor's operations as a whole. Specifically, the Debtor's failure to remit the Taxes could adversely affect the Debtor's business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtor or prevent the Debtor from continuing its business and administering its estate, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the process of maximizing the value of its estate; (b) the Taxing Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (c) some of the Taxing Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtor does not pay the Taxes; and (d) certain directors, officers and/or employees of the Debtor might be subject to personal liability, which, in addition to giving rise to potential indemnity obligations owed by Debtor would distract these key personnel from their duties related to the Debtor's operations.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 25 -

Case: 16-30063    Doc# 6    Filed: 01/22/16    Entered: 01/22/16 15:30:40    Page 25 of 26

**H.** **MOTION FOR ORDER TO ESTABLISH CERTAIN NOTICING PROCEDURES**

80. There are approximately 2,000 parties in interest in this case according to the mailing matrix list filed with the Court (including some 1,100 independent contractors who drive taxicabs with the Debtor's "color scheme."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 22nd day of January, 2016 in San Francisco, California.


                                                    /s Pamela Martinez
                                                    Pamela Martinez

32416\5256148.3

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

PAM MARTINEZ DECLARATION ISO
DEBTOR'S FIRST DAY MOTIONS

- 26 -