John D. Fiero (CA Bar No. 136557)
Jason H. Rosell (CA Bar No. 269126)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
E-mail: jfiero@pszjlaw.com
jrosell@pszjlaw.com

Counsel to the Official
Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>YELLOW CAB COOPERATIVE, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-30063<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**<br><br>Date: October 21, 2016<br>Time: 10:00 a.m. (Pacific Time)<br>Place: 450 Golden Gate Avenue<br>16th Floor, Courtroom 17<br>San Francisco, CA 94109<br>Judge: The Hon. Dennis Montali |

**I.**

**STATEMENT OF FACTS**

**A.** **General Background and Filing of the Case**

The Debtor provides taxicab transportation services in San Francisco to medallion owners under a county-authorized color scheme that is part and parcel of a highly regulated environment. The Debtor has filed pleadings with the Court indicating it is a non-profit service company that provides an operating base for approximately 522 San Francisco taxi medallions, operating on a

cooperative basis. At the outset of this case, the Debtor represented that supported approximately one-third of the total taxicab medallions operating in San Francisco.

The Debtor filed its voluntary petition on January 22, 2016. The initial members of the Committee were appointed on February 3, 2016. Today, the Committee has five members – four of whom are accident victims and the fifth of whom is a class of plaintiff drivers who were underpaid by the Debtor. The filed claims in this case aggregate to more than $42 million, and the Committee's members hold just over one-third of those claims.

B. **Prepetition Malfeasance by Yellow Cab**

The principals of YCC have operated the city's largest taxi cab business with a "creditors be damned" attitude for a long time. That attitude is evident in the fact that for many years, YCC operated its fleet of taxis under the ruse of "self-insurance." Today (and even before the Committee gets to the bottom of how the Debtor's captive Cayman Islands-based insurer ended up insolvent with literally tens of millions of dollars of unpaid claims), it is clear that the Debtor's management was not interested in making sure that all claims of accident victims would be satisfied. The bottom line is that YCC for years carried "self-insurance" of $250,000 per occurrence with nothing more to backstop losses than its net worth as a going concern. YCC management knew this was insufficient. Indeed, Note 11 to YCC's April 30, 2011 audit report states:

> Chariots of Hire Insurance Company-Cayman provides automobile insurance coverage for the Cooperative on the first $250,000 for each occurrence. Management is seeking additional coverage and is actively examining various available options. To date all insurance proposals have been financially prohibitive.

*See Declaration of Patrick J. O'Malley in Support of Motion to Appoint a Chapter 11 Trustee* ("O'Malley Declaration") at ¶ 6 and Exhibit A thereto.

It should not go unnoticed that this report was issued *after* Committee Chair Ida Cristina Fua suffered her horrific injuries in a YCC taxicab in 2011 – injuries that yielded a judgment exceeding $8 million. O'Malley Declaration at ¶ 11. This begs the question: was additional insurance coverage really "financially prohibitive" or did the Debtor's management simply put the interests of equity ahead of the interests of YCC's customers and creditors year after year?

2

The Debtor's attitude was also on display in 2007 when YCC elected to spin off its most valuable asset – 1200 Mississippi Street in San Francisco (the "Property") – to a newly created entity called Taxi Property Company, LLC ("TPC").[1] At the time of the transfer, the members of YCC and TPC were identical, and YCC valued the Property at $14 million. Today, it is possible the Property is worth more than $25 million. O'Malley Declaration at ¶¶ 7-8. A May 7, 2007 letter from YCC's counsel to its medallion holders sheds light on the Debtor's mindset as it began the series of transactions that unbundled its assets so that the value of those assets would not be subject to creditor claims in the future. Among other things, the letter stated:

> We have thought about for years trying to get the Property out of the corporation, because it was the right business decisions [sic], but the tax impact always stood in the way; but the unfortunate accident loss took care of much of that problem. However, we are a taxi company, and those things happen and could well happen again. Now the growth in value of the Property will be out of the reach of creditors, and the biggest asset other than your individual permits themselves has been moved outside of the transfer limitation problems.

*Declaration of John D. Fiero in Support of Motion to Appoint Chapter 11 Trustee* ("Fiero Declaration") at ¶ 2 and Exhibit A thereto.

The "creditors be damned" attitude was also on display when the Debtor made a practice of distributing all of its net income and, in some years, monies in excess of net income to medallion holders without regard to what the Debtor's patronage calculation formula would have supported. What YCC should have done – and what careful and competent management would have done – is fund an insurance reserve to account for the fact that "we are a taxi company, and those things happen and could well happen again." O'Malley Declaration at ¶ 9. As a leading legal treatise on cooperatives makes clear:

> [I]n addition to generating income sufficient to cover operating costs, cooperatives must also ensure that sufficient income is retained to meet future capital needs, as well as unexpected expenses.

C. Autry, *The Law of Cooperatives* (2009 Ed.), p. 80.

---

[1] TPC is the transferee of several other assets that used to be part of the Debtor's balance sheet, including All Taxi Dispatch ("ATD") and Peninsula Yellow Cab ("PYC").

3

DOCS_SF:91938.6
Case: 16-30063   Doc# 329-1   Filed: 09/23/16   Entered: 09/23/16 16:15:36   Page 3 of 17

Yet another instance of malfeasance occurred in 2011 when another subsidiary of TPC named San Francisco Gold Car Service, LLC ("SFGC") commenced operations in the limousine service business for both private and corporate customers. SFGC did not own its own vehicles but rather used private limousine owners to provide services, earning commissions of generally 20% of the billed fares. In January, 2012, SFGC ceased operations after suffering a net loss of approximately $250,000 during its short life.

Despite the fact that SFGC was a subsidiary of TPC, the Committee is informed and believes that the Debtor provided SFGC the necessary startup funds (without any known documentation). Because SFGC was unable to repay the indebtedness, the Debtor then forgave the debt at year-end 2011. There are no known board of director minutes of YCC authorizing either the extension of credit to SFGC nor the forgiveness of the debt. It is evident that TPC took a business risk using the Debtor's money rather than its own. The Debtor received *no* value, let alone reasonably equivalent value in exchange for these transfers. To the extent the Debtor was insolvent at the time of either the transfers to SFGC or the forgiveness of that entity's debt, under the trust fund doctrine, the Debtor's board members are liable for those lost funds and a claim for fraudulent transfers may also be asserted against TPC as the entity for whose benefit the transfers were made. O'Malley Declaration at ¶ 13 and Exhibit D thereto.

The Debtor is a cooperative corporation whose formation and rules regarding distributions to its patron members (and the limitations thereon in the event of insolvency) are governed by the California Corporations Code. According to the *First Day Declaration of Pamela Martinez* [Docket No. 6] (the "Martinez Declaration"), only 281 "direct" members are entitled to receive patronage and other distributions. Martinez Declaration at ¶ 7. The Debtor's counsel has argued repeatedly that all prepetition payments to medallion holders were proper "patronage distributions" exempt from clawback under the California Corporations Code and, thus, could never be recovered postpetition. However, the Committee's recent deposition of YCC's President, Pamela Martinez, yielded a host of admissions that contradict this position. Specifically, the Committee learned that beginning in 2012, Ms. Martinez and the other responsible parties at YCC abandoned all pretense of properly calculating patronage distributions because such calculations yielded amounts that were insufficient

4

to meet the demands of management. Indeed, rather than follow a carefully-crafted formula that had been in place since 1977, Ms. Martinez was instructed monthly by "management" to pay medallion holders an amount in excess of what the medallion holders (including those in management) were entitled to receive. Among other testimony, Ms. Martinez shared the following in her August 11, 2016 deposition:

- She prepared a calculation of income less expenses available for distribution regularly from 2000 – 2008 and then intermittently from 2008 – 2012, during which period her calculations did not show an acceptable amount available for patronage dividend distributions.

- In certain instances, Ms. Martinez was informed (orally) by either Nathan Dwiri, Hal Mellegard, or Jim Gillespie to make patronage dividend distributions of amounts that differed from what she had calculated.

- Ms. Martinez stopped preparing any calculations of income less expenses available for patronage dividend distributions after some point in 2012 when she realized the methodology for determining payments to members was going to yield amounts below management's expectations.

- YCC ceased making patronage dividend distributions to members in 2015 as it was not generating enough revenue to give checks to the members. Jim Gillespie – the Debtor's former president – made the decision to stop; the discussions about the problem had been continuous for several years leading up to 2015.

- Ms. Martinez said: "Too much money was being allocated to owners, then there wasn't any money."

*See* Fiero Declaration at ¶ 5 and Exhibit D thereto at 11:3-13:15; 13:19-14:15; 16:16-17:7; and 122:21-123:3.

Today, Mr. Mellegard is the General Manager of the Debtor. Mr. Dwiri is a member of the board of managers of TPC (the Debtor's landlord), and is in constant communication with Ms. Martinez. Shortly after the commencement of this chapter 11 case, Mr. Gillespie transferred his medallions from YCC to Citywide Taxi, where he is also employed in the business development area.

Ms. Martinez's admissions are bolstered by the Committee's discovery on other fronts. The work papers of auditor Douglas Taylor (also the Court-approved accountant for the Debtor in this case) reveal the following comments about 2012 overpayments:

5

DOCS_SF:91938.6
Case: 16-30063    Doc# 329-1    Filed: 09/23/16    Entered: 09/23/16 16:15:36    Page 5 of 17

> "Adjustment" is additional compensation paid to owner/operators to encourage them to stay with YCC rather than go to a competitor. The monthly adjustment is recorded in the minutes; in 2011-2012, it was $450-$500 per month (per medallion) at an average of $494 per month. This program was only in force during the last ten months of the year.

*See* Fiero Declaration at ¶ 5 and Exhibit E thereto.

As mentioned briefly above, perhaps the greatest significance of this 2012 deviation from the company's prior use of its formula to simply passing out money to owners in amounts that the Debtor's management deemed appropriate is that the deviation occurred *after* Committee chair Ida Cristina Fua was severely injured in a YCC taxicab, suffering partial paralysis, a traumatic brain injury, and other injuries. Today, Ms. Fua holds a judgment against the Debtor in an amount exceeding $8 million. Did the knowledge of this tragic and cataclysmic accident cause YCC to do anything differently when it came to preserving its capital? No, quite the opposite.

Prior to January 2015, under its own license to do so, the Debtor provided its own dispatch service as an in-house operation. The Committee is informed and believes that, in January 2015, the Debtor caused the formation of All Taxi Dispatch LLC ("ATD") as a standalone entity to provide dispatch services to its drivers, and potentially other taxicab companies. The Debtor funded no less than $80,000 for the creation of ATD and entered into a real property lease for premises to be occupied by ATD. However (and apparently as a surprise to at least the president of YCC), ATD did not become a subsidiary of the Debtor, but rather was created as a subsidiary of TPC. It does not appear that the Debtor received any consideration from TPC for this transfer, let alone reasonably equivalent value. From the information discovered to date, it does not appear that the Debtor saves any money by reason of the divestiture of its dispatch services. Additionally, ATD provides its dispatch service under a county-issued permit that is held by the Debtor, and for which the Debtor receives no additional consideration. And yet the Debtor pays ATD approximately $50,000 per month for dispatch services. O'Malley Declaration at ¶¶ 14-16.

C. **Postpetition Malfeasance by Yellow Cab**

Several months into the case, the Debtor sent its cooperative members (*i.e.*, the medallion holders) a letter dated May 26, 2016 (the "May 26 Letter") in which Pamela Martinez, the Debtor's President and Controller, wrote:

> One thing that has been made very clear by the Creditors Committee is that the patronage dividend will have to be considered obsolete as all money from this scenario will be considered as profit for creditors. Under bankruptcy, shareholder profit is not allowed until and unless every other party is made whole first.
>
> Medallion rental fees however, are allowed. . . . In order for you as medallion holders to receive funds for your medallion, the Board has unanimously decided to offer you a lease that gives us permission to rent your medallion. ***The Coop, as we have known it is essentially gone. A monthly lease is being drawn up and will be sent to you next week.*** All Yellow Cab stockholders will have the choice of signing the lease and receiving a rental check with the understanding that YCC stock has no value. You are welcome to not accept the lease. If you do not accept the lease, the stock will still be worth nothing and we will not be able to rent your medallion. YCC will be considered the same as every other cab company in San Francisco.

May 26 Letter (emphasis added); Fiero Declaration at ¶ 3 and Exhibit B thereto. The genesis of this letter has never been adequately explained. Did bankruptcy counsel advise the board that taking the Debtor's equity/medallion holders and turning them into administrative creditors of the estate was an appropriate discharge of its fiduciary duties? Did counsel advise the board that such conduct was within the ordinary course of business? What metrics or evidence did the board have before it that caused it to vote unanimously to offer leases to the medallion holders? Was there any analysis provided or presentation made that showed the shift in cash flow created by such a change in business model? Based on the Debtor's failure to provide any such documentation in response to the Committee's request, the Committee can only conclude that the Debtor's board made this decision without the benefit of any such analysis. As such, the decision was a reckless one inconsistent with the standards to which chapter 11 debtors are held.

Another example relates to the Debtor's lease of the Property now owned by TPC. The lease provides (emphasis added):

7

> From September 1, 2016 through August 31, 2026 Minimum Monthly Rent shall be determined with reference to the Fair Market Rent as of September 1, 2016, as adjusted on each Rent Adjustment Date in the manner provided in this subsection. ***Fair Market Rent means the monthly rent that a tenant would be willing to pay to lease the Premises on September 1, 2016 under the terms of the Lease solely for the purpose of operating a taxi cab business.*** The Fair Market Rent shall be determined by a licensed real estate broker mutually acceptable to Owner and Tenant. If Owner and Tenant cannot agree upon the selection of a real estate broker to determine the Fair Market Rent by the Rent Redetermination Date, then within twenty days after the Rent Redetermination Date Owner and Tenant shall each select a licensed real estate broker having not less than five years experience leasing comparable property in San Francisco, and those two brokers shall, within twenty business days, select a third licensed real estate broker who shall determine the Fair Market Rent as promptly as practicable.

The Debtor and TPC engaged in this re-valuation process over the summer. However, the broker chosen to perform the analysis did not consider the fact that the tenant would be a taxi cab business and adopted a monthly rental value for the Property of $156,643.00 per month, almost doubling the previous monthly rent of $82,100. Notwithstanding this obviously flawed valuation methodology (and the Committee's calling attention to the flaw in repeated communications with Debtor's counsel), the Debtor has done nothing to challenge the improper valuation or the imposition of increased rent. O'Malley Declaration at ¶¶ 17 and Exhibits H and I thereto.

### D. The Debtor's Adversarial and Secretive Posture Against Creditors

The Committee had no advance notice and was not made a part of the negotiations that led to the May 26 Letter. But this is hardly the only example of the Debtor taking action without consulting the Committee. The *Debtor's Chapter 11 Plan of Reorganization Dated August 22, 2016* (the "Plan") was submitted without input from the Committee and in contradiction of the Committee's preference that the Debtor let the "exclusive periods" set forth in Bankruptcy Code section 1121(c) expire. In the terms of the Plan, once again, the Debtor has demonstrated the extent of the blinders it wears with regard to the conflicts of interest inherent in its management structure. Section D.2.a of the Plan provides as follows:

> Each Holders [sic] of a Class 4 Interest, in its sole and absolute discretion, can elect to relinquish their Pro Rata share of common stock in Reorganized Yellow Cab in exchange for a full and complete release of any and all Avoidance Actions that the Estate may have against them, including, without limitation, with respect to any patronage distributions, patronage dividends or similar amounts paid by the Debtor to such Holder of a Class 4 Interest. Such election may be set forth by the Holder of a Class 4 Interest on the ballot for the Plan or in such other manner as the Bankruptcy Court may authorize.

Leaving aside how "out of the money" equity could possibly end up with a share of a reorganized debtor in the absence of bona fide new value, this effort to take one of the estate's best and most easily proven claims (the Debtor's claims against the medallion holders for receipt of improper "patronage distributions") and surrender them for no return value shows exactly why the Debtor must come under the stewardship of a chapter 11 trustee. Simply put, the Debtor cannot be trusted.

The Debtor has been secretive and uncooperative in other areas, too. Specifically, a potential purchaser of the Debtor's assets has recently come forward with an expression of interest. Among the employees of that purchaser is James Gillespie, a recent former officer of the Debtor. Mr. Gillespie also owns a share of TPC. The Committee inquired whether Committee counsel could attend the first meeting with the purchaser as an observer and on the understanding that no comments would be made at the meeting. The Debtor turned this request down, and then declined to provide any written report of the meeting, requiring instead that any debriefing be by telephone. Obviously, in a case like this, where insiders have shown little regard for anyone other than themselves for a period of years – both prepetition and postpetition – the possibility of a sale and cash consideration coming into the estate is an opportunity requiring the most careful stewardship. That steward should be a chapter 11 trustee.

Finally, the Court is well aware of the Debtor's resistance to the Committee's request to succeed to the attorney-client privilege in connection with control of the claims (which are the only asset likely to produce a meaningful dividend in this case). If the Debtor had the real interests of this insolvent estate at heart – and cared about the dividend – it would not have opposed the relief sought by the Committee. The Debtor did just the opposite, imposing yet another roadblock to a creditor recovery. Fiero Declaration at ¶ 4 and Exhibit C thereto.

9

DOCS_SF:91938.6 Doc# 329-1 Filed: 09/23/16 Entered: 09/23/16 16:15:36 Page 9
Case: 16-30063 of 17

### E. The Debtor's Conflicts of Interest

The Debtor is a California corporation organized as a cooperative. Accordingly, the interests in the Debtor are held by Members, who operate the cooperative through a board of directors sourced entirely from its membership. There are no outside directors. Accordingly, each member of the Debtor's board of directors (including company president Pam Martinez) owns a medallion and, as a member of the cooperative, received alleged "patronage distributions" while the Debtor was insolvent. Each member of the Debtor's board of directors owns an equity interest in TPC and, by extension, ATD, PYC and the other affiliates discussed herein. The Committee is informed and believes, and thereon alleges that there is more than 80 percent overlap between the Debtor's medallion holders and the equity interest holders of TPC. O'Malley Declaration at ¶ 20 and Exhibit J thereto.

This litany of action and inaction by the Debtor evidences the Debtor's bad faith and incompetence in the management and prosecution of this chapter 11 case. Allowing the Debtor to continue to control the progress of this case will unnecessarily delay for many months the process to confirm a reasonable, acceptable plan designed to maximize the value of its claims and assets – to all of which creditors are entitled. It would also taint any effort to sell the Debtor's assets for the same reasons.

## II.

## ARGUMENT

### A. Legal Standards for Appointment of a Trustee

The appointment of a chapter 11 trustee is governed by section 1104(a) of the Bankruptcy Code, which provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the Court shall order the appointment of a trustee –
>
> (1) For cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

>   (2) If such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a). The determination of "cause" under section 1104(a)(1) is within the broad discretion of the court. *Lowenschuss v. Selnick (In re Lowenschuss)*, 171 F.3d 673, 685 (9th Cir. 1999); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). If the court finds "cause," then appointment of a trustee is mandatory. *Oklahoma Refining Co. v. Blank (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989). Depending on the circumstances, factors in determining if there is cause to appoint a trustee may include: (1) the existence and materiality of any misconduct on the part of the debtor in possession; (2) the evenhandedness in dealing with insiders or affiliates; (3) the existence of preferences or fraudulent conveyances; (4) the unwillingness or inability of management to purse the estate's causes of action; (5) conflicts of interest on the part of management of the debtor in possession; and (6) self-dealing by management or waste of corporate assets. *See, e.g., In re Intercat, Inc.*, 247 B.R. 911 (Bankr. S.D. Ga. 2000).

Incompetence and mismanagement are perhaps the most common grounds for appointment of a trustee for "cause" under section 1104(a)(1). *See Sharon Steel*, 871 F.2d at 1226. However, the language of section 1104(a)(1) does not promulgate an exclusive list of causes for which a trustee must be appointed. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998) (upholding lower court's appointment of a trustee where (1) acrimony between debtor and its creditors rose to the level of "cause," and (2) appointment of a trustee was found to be in the best interests of the parties and the debtor's estate); *In re Colorado-Ute Electric Association, Inc.*, 120 B.R. 164, 173-74 (Bankr. D. Colo. 1990) (court "need not find any of the enumerated wrongs in the statute to find cause to appoint a trustee"). It has been recognized by courts that the language "or similar cause" in section 1104(a)(1) encompasses a wide range of conduct, and must be made on a case-by-case basis. *Sharon Steel*, 871 F.2d at 1226.

In some cases, "acrimony" or a deep seeded conflict between the debtors and their creditors (as in this case due to the Debtor's bad faith dealings with the Committee and the Committee's

11
DOCS_SF:91938.6
Case: 16-30063   Doc# 329-1   Filed: 09/23/16   Entered: 09/23/16 16:15:36   Page 11 of 17

justified loss of confidence in the Debtor) can also give rise to the level of cause under section 1104(a)(1), which the Third Circuit in *Marvel Entertainment* relied upon to uphold the lower court's appointment of a trustee. *Marvel Entertainment*, 140 F.3d at 475 (citing *Colorado-Ute Elec. Assoc.*, in which a trustee was appointed where serious conflicts among debtor, its board of directors and creditors made the prospect for gridlock seem more probable than the ability to rehabilitate debtor)).

Even if there is no "cause," section 1104(a)(2) allows appointment of a trustee to address "the interests of the creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). *See, e.g., Sharon Steel*, 871 F.2d at 1226; *Committee of Dalkon Shield Claimants v. A..H. Robins*, 828 F.2d 239, 242 (4th Cir. 1987); *In re Ionosphere Clubs, Inc*., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990). "Unlike § 1104(a)(1), which provides for mandatory appointment upon a specific finding of cause, § 1104(a)(2) 'envisions a flexible standard.' It gives the district court discretion to appoint a trustee 'when to do so would serve the parties' and estate's interests.'" *Marvel Entertainment*, 140 F.3d at 474. Among the factors that may be considered by courts – interrelated factors in many cases – are (i) the trustworthiness of the debtor, (ii) the prospects for the debtor's rehabilitation guided by present management, (iii) the creditors' confidence, or lack thereof, in present management, and (iv) the benefits derived from appointment of a trustee, balanced against the cost of the appointment. *See, e.g., Ionosphere Clubs,* 113 B.R. at 168; *In re Microwave Products of America, Inc.,* 102 B.R. 666, 675 (Bankr. W.D. Tenn. 1989); *In re Cardinal Industries, Inc*., 109 B.R. 755, 767 (Bankr. S.D. Ohio 1990). In many cases, courts have found the appointment of a trustee under section 1104(a)(2) appropriate where there was such a loss of confidence in the debtor in possession that the failure to appoint a trustee would "jeopardize whatever chance exists to realize the potential value of these estates." *Cardinal*, 109 B.R. at 767. *Accord, Microwave Products*, 102 B.R. at 676 (trustee was in best interest of estate "based in part on the considerable and continuing erosion of confidence in the debtor . . . to operate the company").

**B.  Cause Exists to Appoint a Trustee under Section 1104(a)(1)**

   **1.  Prepetition Misconduct Supports the Appointment of a Trustee**

As the plain language of section 1104(a)(1) makes clear, improper prepetition conduct of the debtor's current management may be sufficient by itself to warrant the appointment of a trustee. *See*

12

11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "either before or after the commencement of the case"); *Lowenschuss*, 171 F.3d at 685 (holding that prepetition transfers of assets, attempts to avoid jurisdiction of Pennsylvania courts, and control over certain estate assets were good cause to appoint a trustee); *In re PRS Ins. Group, Inc.*, 274 B.R. 381, 390 (Bankr. D. Del. 2001) (evidence showed that debtor's president, sole director and sole shareholder and his other companies received transfers of $32 million, and this insider received $3.5 million on account of personal expenses and also failed in his duties by allowing the confiscation of other assets by third party); *In re Main Line Motors, Inc.*, 9 B.R. 782, 784 (Bankr. E.D. Va. 1981) (cause under section 1104(a)(1) exists to appoint a trustee, where the president and sole shareholders of the debtor had withdrawn substantial sums from the debtor's operation, and placed them in control of two non-debtor affiliates over which the owner had control).

As discussed above, the Debtor's management has (a) failed to maintain proper and adequate insurance (adopting instead the ruse of self-insurance with a now insolvent captive Cayman insurer); (b) failed to create or maintain adequate capital reserves for unpredictable but inevitable liability events associated with traffic accidents; (c) intentionally transferred its most valuable (and likely to appreciate) asset into a sister company immune to the ordinary reach of creditors; (d) distributed more cash than it had net income and also paid alleged patronage dividends without regard to the carefully crafted formula; (e) paid out excessive dividends to equity without regard for the harm suffered by Ms. Fua in 2011; (f) created SFGC for the benefit of TPC and then allowed YCC to absorb the quarter million dollar loss; (g) spun off its dispatch services to a new TPC subsidiary and funded that transfer with money from YCC that was not repaid; (h) allowed YCC to become the guarantor of the ATD lease in Las Vegas for no consideration and also causing YCC's dispatch permit to be used at no cost to ATD; and (i) agreed to revised rental terms for 1200 Mississippi that could never be paid under the Debtor's current cash flow structure based upon an obviously flawed value analysis.

13

### 2. The Debtor's Postpetition Mismanagement, Incompetence and Bad Faith Support the Appointment of a Trustee

As detailed above, the Debtor has operated postpetition much as it operated prepetition, which is to say without regard to the fiduciary duties YCC owes to creditors. Specifically, the Debtor has shown time and again how it is hobbled by its conflicts of interest. The postpetition malfeasance events include: (a) the preparation and dissemination of the May 26 Letter; (b) the mishandling of the 1200 Mississippi lease re-valuation; (c) the Debtor's decision to go to the expense of filing a plan and disclosure statement that cannot be confirmed and that only further demonstrates how the Debtor is intertwined with the estate litigation target; and (d) the refusal to let the Committee play a meaningful role in negotiating a potential sale in this case where every dollar generated by the sale will go to administrative or unsecured creditors, and not to the Debtor's equity holders.

Regardless of whoever is truly controlling the Debtors, the Debtors' postpetition conduct evidences the Debtors' focus in this case is something other than maximizing the value of the estate for the benefit of the Debtors' creditors. Such mismanagement and bad faith on the part of the Debtors make clear that the Debtors cannot be entrusted with managing the estates' assets and affairs, and constitute cause for the appointment of a trustee. *See, e.g., In re V. Savino Oil and Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("The willingness of Congress to leave a debtor-in-possession is premised an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, [s]ection 1104(a)(1) [of the Bankruptcy Code] commands that stewardship of the reorganization effort must be turned over to an independent trustee."); *see generally Wolf v. Weinstein*, 372 U.S. 633, 651 (1963) (willingness of courts to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee"); *Hirsch v. Penn. Textile Corp. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and preserve the debtor's property.") (internal citations omitted).

## C. A Trustee Should Be Appointed in the Interests of Creditors Under Section 1104(a)(2).

Even if there were insufficient "cause" mandating the appointment of a trustee, a trustee should be appointed in the best interests of creditors under section 1104(a)(2).

All of the circumstances described above in detail should demonstrate to the Court that no true progress can be made in this case if the Debtor remains as a debtor in possession, to the significant detriment of the estates and creditors. From the time the Committee was formed, disputes have arisen between the Debtor and the Committee over how the case should proceed and which constituency is the appropriate party to control the case. Although the Committee has sought to be a consultation party on various aspects of the business, it has for the most part been shut out. For example, the Committee was never consulted on (i) the decision to assume certain leases or obligations, (ii) the decision to terminate certain leases, (iii) the calculation of the fair market rent for the Property, or (iv) the terms of the Plan. Although the Debtor operates under the protection of the Bankruptcy Code and has an opportunity to operationally restructure its business for the benefit of all constituents, it is abundantly clear that the Debtor is squandering this opportunity and has failed to make any significant changes in its operational strategy. In fact, the Debtor's delay in moving this case forward has created timing problems for the Debtor. For example, the Debtor was forced to file a Plan that is unconfirmable, simply to prevent its exclusivity period from expiring. Similarly, the time to assume or reject nonresidential real property leases has expired and now the Debtor must attempt to delay this process with the consent of its landlord. The Court's assistance is needed at this point to advance this case for the benefit of the Debtor's estate.

The desires of creditors – who the Court has recognized are the true stakeholders in this case – for the immediate appointment of a trustee should carry great weight in the Court's analysis of section 1104(a)(2) of the Bankruptcy Code. The interests of creditors will be served by immediately by the granting of this Motion. Among other things, the appointed trustee – a neutral and qualified third party – will (i) analyze whether it is in the best interests of creditors to sell the Debtor's assets or attempt to reorganize, (ii) establish a fair sale process free of collusion by the Debtor's former principals, if such a sale is in the best interest of creditors, (iii) assist the Committee with its continuing investigation by reviewing documents and communications currently subject to the

15

attorney-client privilege, (iv) negotiate the terms of a consensual plan of reorganization or liquidation, and (v) promptly and appropriately deal with developing case matters.

The Committee has reviewed the costs and uncertainties, if any, that could arise by the appointment of a trustee and the potential benefits of such appointment, and believes the scale tilts overwhelmingly in favor of a trustee. Justifiably so, the members of the Committee – creditors holding many millions of dollars of claims against the Debtor – have no faith in the Debtor and its decision-making and management ability. Certainly, to the extent that Debtor's counsel may be making or forcing certain decisions, such control and management of the Debtor is improper. To the extent that the Debtor's former principals, such as Mr. Gillespie, Mr. Dwiri, Mr. Welch, and/or other insiders may be exerting control over the Debtor, a fraud is being perpetrated against the Court, the Committee, and the Debtor's estate. Such insiders should have no role at all in the management of the Debtor in light of their prepetition malfeasance and conflicts of interest, especially in light of the Committee's commencement of lawsuits against some of them. To the extent that Ms. Martinez is controlling and managing the Debtor's case, she lacks the experience and qualifications to serve as, in effect, the chief restructuring officer of the Debtor.

Under these circumstances, it is impossible to imagine a timely, successful resolution of this case without the intervention of a trustee. *See, e.g., Cardinal, supra*, 109 B.R. at 767 (ordering appointment of trustee and giving great weight to analysis of creditors; "[W]hat value exists belong to creditors . . . . Since the Creditors, which hold unsecured debts, are willing to risk the costs, uncertainties and dislocations occasioned by the appointment of a trustee, the Court will exercise its equitable powers to order that appointment."); *Colorado-Ute,* 120 B.R. at 177 (discussion of benefits and costs of trustee appointment, including conclusion that the cost of professionals for trustee would not exceed, and would likely be less than the cost of professionals for debtor, including assumption that an independent trustee – "in whom the creditors have confidence"– would expend less on professional fees and estate resources because his relationship with creditors and other parties would likely be less confrontational and litigious).

16

## III.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court enter an order (i) granting the Motion, (ii) directing the appointment of a chapter 11 trustee, and (iii) granting such and further relief as may be just and appropriate.

Dated: September 23, 2016                              PACHULSKI STANG ZIEHL & JONES LLP

                                                      By: */s/ John D. Fiero*
                                                          John D. Fiero
                                                          Jason H. Rosell

                                                          Counsel to the Official
                                                          Committee of Unsecured Creditors