John D. Fiero (CA Bar No. 136557)
Jason H. Rosell (CA Bar No. 269126)
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone:  (415) 263-7000
Facsimile:  (415) 263-7010
E-mail:   jfiero@pszjlaw.com
             jrosell@pszjlaw.com

Counsel to the Official
Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>YELLOW CAB COOPERATIVE, INC.,<br><br>                    Debtor. | Case No. 16-30063 (DM)<br><br>Chapter 11<br><br>**REPLY IN SUPPORT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**<br><br>Date:     October 21, 2016<br>Time:    10:00 a.m.<br>Location:  450 Golden Gate Avenue<br>              16th Floor, Courtroom 17<br>              San Francisco, California<br>Judge:   Hon. Dennis Montali |

The Official Committee of Unsecured Creditors (the "**Committee**") of Yellow Cab Cooperative, Inc. (the "**Debtor**") hereby files its reply in support of the *Motion for Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 329] (the "**Motion**").[1]

## INTRODUCTION

Once again, the Debtor has responded to the Committee's allegations of debilitating conflicts of interest with silence.  Since those are the very allegations which the Court has already found constituted cause to transfer the Debtor's litigation claims away from the Debtor, they should also form the basis of the Court's decision to appoint a chapter 11 trustee.  The Debtor is at a precarious

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

moment in its effort to reorganize.  It has filed a plan of reorganization which prefers medallion holders and affiliates to the Debtor's creditors, while it is also in the midst of discussions about a sale of the Debtor's assets as a going concern.  These activities form the core of chapter 11.  They require the Debtor to have an absolute and steadfast allegiance to the best interests of the estate.   But there is no evidence that the Debtor is capable of such allegiance.  As the evidence shows, the Debtor is impaired by its conflicts of interest.

For example, the Debtor does not dispute: (i) that the Debtor's President, Director, and Controller, Pamela Martinez, is a member of the Board of Directors of TPC (the Debtor's landlord and a litigation target of the Committee); (ii) that Ms. Martinez is involved with the operations of TPC's subsidiaries (also litigation targets of the Committee because they represent investments by the Debtor made apparently for no consideration); (iii) that the Debtor's special counsel, Philip Welch, is a member of the Board of Directors of TPC and moved his medallions from the Debtor to Flywheel Taxi (the Debtor's competitor); (iv) that the Debtor's former President, James Gillespie, is a member of the Board of Directors of TPC and moved his medallion from the Debtor to Citywide Taxi (the Debtor's competitor); and (v) that Citywide Taxi has expressed interest in purchasing the Debtor.

These debilitating conflicts of interest are as visible in postpetition activities as they are in the Debtor's rogue past.  The time to rescue this case from these conflicts has come because it is clear the Debtor's existing control structure cannot handle the job.  The Motion should be granted.

## STATEMENT OF FACTS RELEVANT TO THIS REPLY

While the Debtor has curiously focused on the declaration testimony of the Committee's financial advisor, it should not go unnoticed what the Debtor does not and cannot refute:

    i.     The Debtor's professionals were fully aware that the Debtor made unlawful patronage distributions while insolvent and other prepetition malfeasance and may be subject to liability.

    ii.    Every member of the Debtor's Board of Directors (the "<u>YCC Board</u>") owns an interest in TPC.

    iii.    TPC, the Debtor's landlord, recently doubled the rent to approximately $156,000 per month, without any objection by the Debtor.

2

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

iv.   The YCC Board undertook substantial steps to enter into medallion leases with each member without bankruptcy court approval.  Only upon discovery of the scheme by the Committee and the Committee's strenuous objection did the YCC Board table the plan to turn the Debtor's equity holders into administrative creditors.

v.    The Debtor's proposed plan of reorganization proposes to release TPC and its affiliates and YCC's members for no real consideration to the estate.

vi.   The Debtor continues to frustrate the Committee's discovery attempts at every opportunity – both when DSI attempts to communicate with the Debtor's President, and when Committee counsel seeks cooperation with discovery necessary to follow up on the estate's claims.

vii.  The Debtor has been engaged in active negotiations to sell its assets to a competing cab company.  Among the executives of that company is the Debtor's former general manager – a man who appeared and answered questions for the Debtor at the continued 341 meeting in March.

Additionally, the Committee has begun its search of the Debtor's email records and uncovered new evidence of the problems with existing management.  These specifically include the fact that it appears the Debtor's President, Pamela Martinez, has been negotiating her own terms of employment with a prospective purchaser – once again putting individuals ahead of the interests of creditors and the estate.  Recent emails also shed light on the contentious relationship between management – namely Ms. Martinez – and the YCC Board.

## ARGUMENT

The Debtor's *Opposition to the Motion by the Official Committee of Unsecured Creditors for Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 347] (the "**Objection**") goes to great lengths to justify the Debtor's questionable prepetition and postpetition actions – regardless of the absurdity of the justification.[2]

---

[2]  Perhaps indicative of the strength of the Debtor's position, the Debtor begins the Objection citing *commentary* in Bankruptcy Local Rule 9013-3 for the proposition that the Motion is procedurally defective.  The Debtor clearly had sufficient notice of the Motion and its objection deadline was even extended with consent of the Committee to accommodate the Debtor's deposition of the Committee's financial advisor.  To the extent necessary, the Court should find that the Debtor stipulated to the effectiveness of service by accepting the Notification of Electronic Filing as effective service (as contemplated by the commentary), seeking and obtaining an extension, and filing a voluminous substantive objection.

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**A.      The Debtor's Defense of Fair Market Rent at 1200 Mississippi is Unintelligible**

The full extent of the Debtor's conflict of interest in matters involving TPC is evidenced by its unreasonable defense of the faulty calculation of fair market rent at 1200 Mississippi. This Court's order [Docket No. 201] directed the Debtor and TPC to utilize a mutually agreed upon real estate broker for determining the fair market rent pursuant to the lease. Fair Market Rent is defined in the lease as "the monthly rent that a tenant would be willing to pay to lease the Premises on September 1, 2016 under the terms of the Lease solely for the purpose of operating a taxi cab business." Rather than determine the value of the property "solely for the purpose of operating a taxi cab business," the broker valued the property as a paid parking lot and a light industrial / office building, resulting in rent of $156,643.00 – nearly double the historical rent.

Rather than challenge the broker's determination of fair market rent, the Debtor takes the absurd position that it was calculated appropriately and in accordance with this Court's order. There is only one explanation for this – the Debtor's members (including every member of the YCC Board) own interests in TPC. Every additional dollar of rent paid by the Debtor to TPC is an extra dollar available to the Debtor's members outside of bankruptcy.

**B.      The Bad Actors are Still Pulling the Strings at Yellow Cab**

The Debtor claims that "almost all of the malfeasance alleged by the Committee in the Motion is not attributable to current management. . . ." Objection at 8:17-18 (emphasis in original). The Debtor argues that Ms. Martinez was not appointed as the Debtor's President until November 2015 and that the Debtor's General Manager was replaced in September 2016. These statements border on violating the duty of candor to the Court.

The Committee learned that the Debtor replaced its General Manager when counsel read the Objection. This is a prime example of the lack of transparency in this case and another reason why a chapter 11 trustee with restructuring experience must be appointed. The Debtor's new General Manager is Paul Gillespie, who informed the YCC Board in May 2016 that he "will pledge to always consider the interests of three groups; the taxi taking public, our drivers both gas/gates and medallion

4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

owners, and the Co-op members themselves." *See* **Exhibit A**.[3] The Debtor's creditors are notably absent from this list of stakeholders.

The Debtor also conveniently omits that Ms. Martinez at all relevant times (both pre and post-petition) has been the Debtor's Controller responsible for making distributions to the Debtor's members, a member of the YCC Board, a member of TPC's Board of Directors, and involved with the operation of TPC's operating subsidiaries. Accordingly, instead of taking the opportunity in November 2015 to appoint an independent President with restructuring experience, the Debtor appointed Ms. Martinez – someone Nate Dwiri and the previous General Manager described in May 2016 as "securing her future" by working with the Debtor's special counsel – Philip Welch – to keep her "part of the deal" in connection with a potential sale of the Debtor's assets. *See* **Exhibit B**. In addition, in an email between Nate Dwiri and the previous General Manager dated May 22, 2015 with the subject line "FUBAR," Mr. Mellegard informed Mr. Dwiri that "I think Pam has co-mingled the Full Associate Funds with the General Account. I hope I'm wrong but . . . Anyhow, some are going to come demanding the money back. Like Peter Witt! Can't you just see that. I think it's about time for my 30 day notice." *See* **Exhibit C**.

Despite Ms. Martinez's apparent self-interest and ineptitude, she remains at the helm of the Debtor. A chapter 11 trustee must be appointed to put someone of trust, disinterestedness, and experience in charge of the Debtor.

The Debtor cannot and does not dispute that each member of the YCC Board owns an interest in TPC. Here is a table showing the 100% overlap for the past two years:

| Current YCC Board Member | Owns TPC Interest? | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| Sheldon Miller | Yes | Yes | Yes | Yes | Yes | Yes |
| Pamela Martinez | Yes | Yes | Yes | Yes | Yes | Yes |
| Tim Lapp | Yes | Yes | Yes | Yes | Yes | Yes |

---

[3] The exhibits to this Reply are all taken directly from the Debtor's email production. Accordingly, the exhibits attached hereto are authentic and admissible as party admissions pursuant to Rule 801(d)(2) of the Federal Rules of Evidence ("**FRE**") or as business records pursuant to FRE 803(6). The Committee will seek the Debtor's stipulation to the authenticity and admissibility of such documents prior to the hearing and, if the Debtor refuses, will use deposition and/or subpoena tools to make sure a proper witness for the Debtor is examined under oath regarding these documents.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| Current YCC Board Member | Owns TPC Interest? | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| Tom Diesso | Yes | Yes | Yes | Yes | Yes | Yes |
| Johnson Akinbodunse | Yes | Yes | Yes | Yes | Yes | Yes |
| Marcelo Fonseca | Yes | No | No | Yes | Yes | Yes |
| Arther Tse | Yes | Yes | Yes | Yes | Yes | Yes |
| Lakew Melese | Yes | Yes | Yes | Yes | Yes | Yes |
| Zuhair Sinada | Yes | No | Yes | Yes | Yes | Yes |
| Nasser Bastanmehr | Yes | Yes | Yes | Yes | Yes | Yes |
| Ali Malik | Yes | No | No | No | Yes | Yes |
| Gerard Nolot | Yes | Yes | Yes | Yes | Yes | Yes |
| Dennis Korkos | Yes | Yes | Yes | Yes | Yes | Yes |

In addition, members of the Debtor's current Board of Directors have made their priorities clear, with one board member stating in June 2016 that the "[n]ext meeting [of the Board] should be focused on ratifying or amending the draft Lease Agreement and anything else can wait. *We have to get $$$$$ to the members ASAP. Members first!!!!*" *See* **Exhibit D** (emphasis added).

Accordingly, despite every opportunity to appoint a committee of independent directors to oversee its bankruptcy case or replace its President or General Manager with a truly disinterested person with restructuring experience, the Debtor has elected not to do so. A chapter 11 trustee is required to provide the necessary disinterestedness and experience to run a sale process and/or implement a plan of reorganization.

To highlight the extent of the TPC's involvement in the Debtor's affairs, the following chart identifies the historical role that each member of TPC's Board of Directors has had with the Debtor.

| TPC Board Member | Debtor Role | YCC Medallion Holder | | | |
|---|---|---|---|---|---|
| | | 2012 | 2013 | 2014 | 2015 |
| Nathan Dwiri | Executive VP (2010, 2013)<br>President Emeritus (2007 - 2009, 2011 - 2012)<br>Board Member (2008 - 2013) | Yes | Yes | Yes | Yes |
| Philip Welch | Special Counsel, former general counsel to YCC | Yes | Yes | Yes | Yes |
| Pamela Martinez | Controller (2008)<br>Treasurer (2011 - 2013)<br>Vice President (2014)<br>President (2015 - 2016)<br>Board Member (2011 - 2016) | Yes | Yes | Yes | Yes |
| James Gillespie | Vice President (2010)<br>Senior Vice President (2011)<br>President (2013 - 2014)<br>Board Member (2007 - 2015) | Yes | Yes | Yes | Yes |
| Richie Wiener | Treasurer (2010 and 2014)<br>President (2011)<br>Board Member (2007 - 2014) | Yes | Yes | Yes | Yes |

### C.  The Debtor Knew the Medallion Lease Proposal Had Been Distributed

The Declaration of Pamela Martinez submitted in support of the Objection states that the May 26, 2016 letter proposing to enter into lease agreements with medallion holders – the letter that refers to the Board's unanimous vote to implement the lease proposal – "was never effectuated or even circulated to them." Martinez Declaration [Docket No. 349] at ¶ 4. However, as evidenced by the email between Nate Dwiri and Pamela Martinez dated June 20, 2016, attached hereto as **Exhibit E**, Clearly, Ms. Martinez knew that members of the YCC Board "gave the letter and lease out downstairs" and created a "poisonous and distrustful atmosphere on the lot." In response, Mr. Dwiri called the circulation of the letter by those board members "[i]diotic." Then, he said "[t]his Board needs to be gone."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### D. The Debtor's Historical Patronage Distributions Were Improper

The Debtor's assertion that its cash disbursements to its Members were appropriate when made is contradicted by both law and fact. To understand the impropriety of these disbursements under California Corporations Code §§ 12200, *et seq.*, certain definitions must be understood.

Corporations Code § 12243, in relevant part, defines "patrons" as, "those persons whose products or services are so marketed, processed, or handled by the corporation." That same section provides that "patronage" of a patron is measured by the volume or value, or both, of "such product or services provided by the patron to the corporation for marketing."

Corporations Code § 12244 defines "patronage distribution" to mean "any transfer made to a patron of the corporation the amount of which is computed *with reference to the patron's patronage of the corporation*." (emphasis added).

California Corporations Code § 12235 defines "distributions" as "the distribution of any gains, profits or dividends to any member as such, *but does not include patronage distributions*." (emphasis added).

It is undisputed that as of year-end 2011, YCC faced a large unliquidated debt resulting from the devastating injuries suffered by Ms. Fua, to say nothing of other claims. The import of Corporations Code § 12453 restricting "disbursements" to Members demonstrates the impropriety of the disbursements to YCC Members under the guise of "patronage distributions" beginning no later than 2012. That section provides, in relevant part (emphasis added):

> Neither a corporation nor any of its subsidiaries shall…make a patronage distribution to members out of earnings of the corporation on *nonmember patronage*, *or make a distribution*, if the corporation or the subsidiary…making the distribution is, or as a result thereof would be, likely to be unable to meet its liabilities (except those whose payments is otherwise adequately provided for) as they mature.

According to the First Day Declaration of Pamela Martinez, as of the Petition Date, YCC had 281 "direct" medallion holding Members and 27 medallion holding Full Associates entitled to receive patronage distributions. However, YCC also serviced (a) 76 medallions of nonmember patron "Associates" who leased their medallions to YCC and (b) 138 medallions of nonmember patron Affiliates who used YCC's "colors" and dispatch services in exchange for a monthly fee. These

8

nonmember patrons represented no less than 40% of all medallions serviced by YCC. Hence, a substantial portion (as much as 40%) of the Debtor's revenues were generated by nonmember patronage as opposed to member patronage.

It cannot reasonably be disputed that from the date of the Fua accident in 2011, the Debtor – having never established reserves for tort claims – could possibly meet its liabilities as they matured or became liquidated. Hence, from no later than January 1, 2012 forward, the only permissible disbursements to the Debtor's Members could not include the earnings on non-member patronage, representing the revenue generated by as much as 40% of the medallions held by its patrons. Nor could the Debtor make "distributions" representing gains or profits from non-member patronage income, such as gasoline sales or repair service income. Nevertheless, nearly every dime that came into the Debtor during those years was disbursed to its Members – and then some.

The Debtor's assertion that the disbursements to its Members between 2012 and the Petition Date did not nearly meet or exceed its earnings and that the disbursements constituted "true" permissible patronage distributions, is belied by Ms. Martinez's Rule 2004 testimony and the records produced by the Debtor's independent accountant, Douglas Taylor. It is also directly contradicted by an email from Ms. Martinez to First National Bank on May 10, 2013. *See* **Exhibit F**. In this email, a bank representative notes and asks, "Net income was lower in 2012 and 2011, but Patronage Dividends were greater. How does Yellow Cab you [sic] calculate the amount of dividends to be paid per year? Why did Yellow Cab pay out more than $2MM more than Net Income in 2012?" Ms. Martinez responded in part (emphasis added in bold):

> IT IS TRUE, WE PAID OUT MORE IN 2012, UNFORTUNATELY SUCCESS IN THIS BUSINESS IS JUDGED BY THE NUMBER OF MEDALLIONS YOU HAVE AND THE LARGER THE NUMBER THE MORE SOLVENT YOU ARE. IN 2012 WE SHOULD HAVE KEPT THE MONTHLY MEDALLION DIVIDEND THE SAME AS 2011. BUT, THE SFMTA INCREASED THE AMOUNT OF MONEY WE SHOULD PAY FOR RENTAL OF A MEDALLION BY 500.00/MONTH (NON-OWNERS). THIS IN TURN MEANT WE MUST KEEP OUR OWNERS HAPPY AND INCREASE THEIR MONTHLY PATR (REFLECTED IN ADJUST **NOT TRUE PATR DIV**) BY A SIMILAR AMOUNT WHICH DECREASED OUR PROFITS.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Ms. Martinez made a similar response to another such inquiry (this time from Ford Motor Credit) in January, 2015. *See* **Exhibit G**. In other words, the Debtor's current president at all times knew she was distributing money in excess of net income and that her reasons for doing so were rooted in what she viewed as expediency, even though she knew it was wrong.

Equally specious is the Debtor's suggestion that the disbursements to Members between 2012 and the Petition Date could not in any way be inappropriate because GAAP does not require reporting of reserves against threatened losses. The fact that GAAP does not require reporting of reserves is irrelevant to the notion that reserves would have been a good idea that would have protected accident victims from an under-insured taxi cab company. Nor would it justify the disbursements made to Members over and above any net revenue generated by any particular member on account of his or her medallion, as precluded by Corporations Code § 12453.

Finally, Debtor argues that the Committee Committee's position is untenable because the Committee has yet to determine the exact amount of improper disbursements that YCC made to its Members that exceeded the amounts permitted by Corporations Code § 12453. This argument is yet a further indication of the need for a chapter 11 trustee. As more fully set forth in the Reply Declaration of Steven J. Kahn, from the date the Committee first requested the data necessary to do such calculation (June 7, 2016), the Debtor has undertaken every effort to prevent the Committee from obtaining that information. First, Ms. Martinez claimed the Member disbursement calculations were all performed by hand, and not on a computer. Later, the Debtor claimed that those handwritten calculations could not be located for production. Later, on August 12, 2016, Ms. Martinez revealed in her limited 2004 examination that she, in fact, entered the data into a "Members Program," on YCC's computers that then made the computations of monthly disbursements to Members. Despite multiple demands for all data within the program (or at least Committee access to such data), ***to this day***, the Debtor has failed to provide full and useful access to that program.

**E.     A Chapter 11 Trustee is Necessary for Attorney-Client Privileged Information**

The Committee acknowledges that the Court rejected the Committee's request for access to the Debtor's privileged documents as part of its role prosecuting the estate claims assigned. In response to the Committee's document requests, the Debtor provided a 100+ page privilege log

10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(which also identified hundreds of postpetition emails between Pamela Martinez and Nathan Dwiri). It is now apparent that the appointment of a chapter 11 trustee is necessary to access these alleged attorney-client privileged documents and assist the Committee with its investigation regarding TPC and patronage distributions. Without an independent review of these materials, the Committee's investigation cannot be completed.

**F.    The Plan Releases are an Example of the Debtor's Bias Against Creditors**

At footnote 14 of the Objection, the Debtor states the "Committee's complaints regarding YCC's filing of the 'unconfirmable' proposed Plan without Committee input is akin to the child that kills its parents and complains of being an orphan." Not surprisingly, the Debtor misses the mark. As evidenced by the email correspondence the Debtor included with its Objection, the Committee was willing to engage in negotiations and/or mediation regarding the terms of a plan if the Debtor agreed to, among other things, the Committee's standing to assert estate causes of action. However, rather than make this concession, the Debtor decided to oppose the Committee's standing motion, and was unsuccessful.

The Plan does not reflect input from the Committee. Even more troubling is that the Plan's terms reflect the Debtor's bias. For example, in addition to the fact that the Plan proposes in Section V.D.2(a) to release Members from claims if they surrender their valueless equity interests, Section VIII.B. of the Plan states:

> On and after the Confirmation Date, except to enforce the terms and conditions of the Plan before the Bankruptcy Court, all Persons or Entities who have held, hold or may hold any debt, Claim, lien, encumbrance against or Interest in the Debtor are ***permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Reorganized Debtor, the Estate Assets, or the Debtor's property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or Entities*** (collectively, the "Protected Parties"); (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, against any of the Protected Parties of any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against any of

11

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Protected Parties; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to any of the Protected Parties; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan.

This injunction effectively releases TPC, as a transferee of the Debtor's real property and various other operating subsidiaries, without any consideration. A chapter 11 trustee is necessary to formulate a confirmable plan of reorganization (or liquidation) that preserves the estate's causes of action or releases them for appropriate consideration.

### G. A Chapter 11 Trustee is in the Best Interests of All Constituents

The Debtor does not dispute that a chapter 11 trustee would be in the best interests of all *creditors*. Instead, the Debtor argues that the standard is what is in the best interests of all constituents and that a chapter 11 trustee is not in the best interests of all constituents due to costs. As the Court is aware, this case is highly contentious. On one hand, there is a Committee comprised primarily of personal injury claimants. On the other hand, you have a Debtor whose failure to maintain adequate insurance or an appropriate risk management program has led to millions of dollars of outstanding personal injury claims – while Members continue to pay discounted "gate" fees to the Debtor postpetition. Adding insult to injury, a member of the Debtor's previous management team is involved with one of the prospective purchasers of the Debtor's assets.

The Committee and the Debtor have disagreed on nearly every issue in this case – primarily because the Debtor's conflicts of interest prevent the Debtor from exercising true independent business judgment. Contrary to the Debtor's assertions, a chapter 11 trustee is likely to *reduce the overall professional fees* in this case by reducing the points of contention and facilitating a mutually agreeable path forward.

The Debtor's other constituents – its members and drivers – may actually *support* the appointment of a chapter 11 trustee and the eventual replacement of existing management. Moreover, it is apparent that the members of the YCC Board and Ms. Martinez have an extremely contentious relationship, to the extent that Ms. Martinez recently informed the YCC Board that she is "insulted that the Conspiracy Theorists here at Yellow have added me to the clump of those they feel have been robbing YCC and believe this is the reason I signed [the Yellow Card Services

12

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

agreement]. Not one member has been honest enough to come to me and address this issue. . . I am disappointed and very dis-heartened to realize some of the very colleagues I work with at every board meeting feel so dis-trustful of me." *See* **Exhibit H**. As a result of this contentious relationship, Ms. Martinez often acts unilaterally without consulting the YCC Board. The YCC Board has expressed concern with such unilateral action. For example, with respect to Ms. Martinez's selection of the General Manager, informing Ms. Martinez that "[i]t would have been better if you had talked to the board before you asked Hal to fill any position. [T]he board had no good relation with the previous GM and I don't think the shareholders will approve that choice." *See* **Exhibit I**. The YCC Board also expressed their disappointment regarding Ms. Martinez's decision to "shrink[] the free shift without consulting the board." *See* **Exhibit H**.

**CONCLUSION**

For all of the reasons set forth above, the Committee requests that a chapter 11 trustee be appointed to administer this case. A proposed form of order is attached hereto as **Exhibit J**.

Dated: October 14, 2016        PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ John Fiero*
    John D. Fiero
    Jason H. Rosell

    Counsel to the Official
    Committee of Unsecured Creditors

13

# EXHIBIT A

**Email from Paul Gillespie – May 1, 2016**

**[Bates Number – YCC0004202]**

| From: | RP Gillespie [rpgsfca@gmail.com] on behalf of RP Gillespie |
| Sent: | Sunday, May 01, 2016 1:04 PM |
| To: | Thomas Diesso |
| Cc: | Pamela Martinez; ali@yellowcabsf.com; Johnson Akinbodunse; Hal; gerard nolot; Lakewm; D. Korkos; Sinadainternational; Nasser Bastanmehr; Managers; sheldon; Arthurktse; Tim Lapp |
| Subject: | Re: YCC inaugural week for PG |

Good afternoon YCC Board members;

Let me offer a few thoughts on the app issue, recognizing that on a matter as fundamental to our business as how people get and pay for the cab, any decision must be made with the input and consensus of the majority of the elected Board of YCC.

In all matters that will come before me as GM, I will pledge to always consider the interests of three groups; the taxi taking public, our drivers both gas/gates and medallion owners, and the Co-op members themselves. That is not in any particular order or hierarchy, all are important.

As to the question of the app, I believe the public and our drivers as well as the Co-op itself, will be best served with a handful (2-4) of really excellent options for connecting with a large percentage of the fleet.

While recognizing the issues with YoTaxi, I am not prepared to totally abandon our legacy YCC system and customer base. Who knows what the future might hold in terms of partnering opportunities or other options to build on? Clearly however, despite our huge volume of traditional phone based orders, YoTaxi is not compliant withe the e-hailing requirements/guidelines as adopted by SFMTA.

Flywheel is an app that many drivers and the public use and like and is at this point for better or worse the only game in town when it comes to MTA compliance. The contract we are being offered doesn't lock us into a long term deal or preclude the introduction of other apps, as I read it. The logistical/theft issues are real and need to be thought through and worked out.

As those of you who have researched this issue know, the taxi hailing app market is in a tremendous state of flux. Product introductions, mergers and acquisitions, and functional breakthroughs are happening on a monthly basis. CMT/Arro has an interesting product and we should engage with them as soon as is practical. No doubt all the major vendors will be appearing later this month at TPAC in SF at the Argonaut hotel.

On Wednesday when Hal and I met with Kate Toran, we pleaded for an additional month to make a decision of this magnitude. Even a week or two would be a big help to all of us. I still have my fingers crossed that we will get this, but even a couple days fines are preferable to a bad deal.

OK, those are some thoughts, now I'm going back to basketball...go Warriors!

Paul Gillespie (PG)

On Sun, May 1, 2016 at 11:38 AM, Thomas Diesso <jake0778@gmail.com> wrote:

to flywheel (ha ha ha),we must stand behind our brand for better or worse. Then we can look at CMT with the Arrow app.

On May 1, 2016 11:28 AM, "pam" <pam@yellowcabsf.com> wrote:

OK, let us all know what you, as a board member wish for today, the deadline for the E-Hail requirement?

Pam

On Sat, 30 Apr 2016 17:31:16 -0700, "D. Korkos" <dogdrive@mindspring.com> wrote:

I didn't read Marcelo's comments as an endorsement of Yo Taxi.

Nor have I seen anything written by Tim or Paul. They should reply to all of us so we can continue to discuss this online.
I do not want approval of Yo Taxi shoved down our throats like George's contract was.

Dennis

On Apr 30, 2016, at 3:47 PM, pam <pam@yellowcabsf.com> wrote:

I would like to hold on signing Monday, get a demo of all the new bells and whistles the Flywheel product has, check in with Phil Ward AND I would like to hand the form to Kate and or Paige on Tuesday. I think all management should be at the meeting also, with as many board members as possible, showing company unity. Any thoughts? Only Marcelo, Johnson, Tom, Tim, Hal and Paul have sent their approval to sign on with YoTaxi.
p.

Board of Directors
Hal Mellegard
Bob Cassinelli
Paul Gillespie

Dear Pam,

I am glad to hear you are in discussions with our attorney regarding this matter; if the MTA is really reviewing the Flywheel App in Redwood City next week, they shouldn't rush us into making a decision by May 1st. Taxi Apps are changing tremendously fast; as we fill out the e-hail application with YoTaxi as our App and try to honor our contract with George Anderson, our regulatory agency must give us more time to review all new Apps and Flywheel's App as well.

Even though I support Flywheel's technology and have always wanted Yellow Cab Co-Op to jump on board with them, I may have to oppose signing a contract with anybody under pressure from the MTA.

When anyone replies to this thread of e-mails, please click REPLY ALL so everyone is copied without breaking the e-mails apart.

This chain of e-mails has been restricted to the Board of Directors, Interim GM Hal Mellegard and PR Bob Cassinelli. I am copying our soon-to-be General Manager Paul Gillespie.

Thank you.

Marcelo Fonseca
415-238-7554

---

From: Hal <hal@yellowcabsf.com>
Sent: Friday, April 29, 2016 4:51 PM
To: pam
Cc: Thomas Diesso; hal@yellowcabsf.com; bob@cassinelliandassociates.com; Marcelo Fonseca; ali@yellowcabsf.com; Johnson Akinbodunse; zee sinada; D. Korkos; Ggnolot; Nasser Bastanmehr; Arthurktse; Lakew Melese; shel.miller; Tim LappWhen you reply
Subject: Re: Flywheel final contract

If they replace 1 or 2 phones a day at Flywheel Taxi, we will
statistically replace 5-10 a day in a fleet our size.  Not to mention the
broken windows. The fine would be cheaper.
I can't see how this mandate would stand under scrutiny.  It is a bit like
passing an ordinance that if you want to sell Apple computers in SF, you
must first install Microsoft Software on them.
This is one decision I'm very happy to let the Board make.
Hal

Attached is the most recent contract with Flywheel. We will have only
the phone portion of their program we will pay 12.00/month/cab for data.
We
will also pay 100.00 for each phone which we must install in each cab. I
have learned also, that at the Flywheel cab company, they replace one or
two phones a day, from people breaking into cabs.

The contract is for one
year. Apparently, this was negotiated by Yellow management on wednesday.

My feeling at this point, stall on flywheel, we are in discussions with
our general law atty. Fill out the ehail application with YOTAXI as our
app, and begin the true fight on this whole issue. SFMTA is going to
review
the Flywheel app in redwood city next week.

Please share how you want to proceed, we have to show unity.

Pam

# EXHIBIT B

**Email from Hal Mellegard – May 15, 2016**

**[Bates Number – YCC0032676]**

| From: | Hal [hal@yellowcabsf.com] on behalf of Hal |
| Sent: | Sunday, May 15, 2016 9:17 AM |
| To: | nate@yellowcabsf.com |
| Subject: | Re: Selling Yellow |

Can you share some of your ideas?  I promise to keep my mouth shut and my mind open.  ==Pam is securing her future.== All I want is some idea where the future might be going so I can make my own plans. I may have 15 years left on this planet and I really don't want them to be spent living in my car or out of a shopping cart on Mission St.
We celebrate our 9th anniversary next week and while the marriage is great, the future is somewhat gloomy. Going to the office is becoming increasingly depressing and full of treachery and deception. Mostly because of one person.  I really disliked Richie and his sneaky, dishonest, scams but he was a outstanding member of the community compared to some.
>
> Yes, I have some ideas but there is nothing firm and I am not sure how
> he can make her part of the deal.
>
>  Do you have any idea of who might be a buyer for Yellow?  Sounds like
>> there have already been some discussions. ==Welch told Pam not to==
>> ==worry as he could make keeping her part of the deal. Amazing how she==
>> ==always lands on her feet.==
>>
>>
>>
>
>
>
>

# EXHIBIT C

**Email from Hal Mellegard – May 22, 2016**

**[Bates Number – YCC0032729]**

**From:** Hal [hal@yellowcabsf.com] on behalf of Hal
**Sent:** Sunday, May 22, 2016 12:43 PM
**To:** nate@yellowcabsf.com
**Subject:** ==FUBAR==

I have 2 guys coming in tomorrow who want to buy/sell stock.  It's complicated though.
Kashmier Deol wants to buy the stock from Lawrence Lay, who bought it from Carol Miller.  She
was taking payments from Lawrence of $500 a month until we quit paying a dividend.  He still
owed Carol $9,000 when he stoped paying.  She is willing to sell the $9000 for $6500.  I
think Deol is willing to pay.  After Welches sitdown the other day though, I'm not
comfortable being part of this. He and I talked about it and agreed if the sale takes place I
need to give full disclosure, which is "the stock isn't worth shit".  I told him that on the
phone Friday and neither speaks English very well and are coming in tomorrow am anyhow.  To
make it even more confusing, Lawrence Lay surrendered his medallion to the MTA and is now a
lease driver for us. What do you think?

So, on a slightly different note, I mentioned that ==I think Pam has co-mingled the Full
Associate funds with the General Account.== ==I hope I'm wrong but...== ==Anyhow, some are going to
come demanding the money back.==
==Like Peter Witt!== ==Can't you just see that.== ==I think it's about time for my
30 day notice.==

# EXHIBIT D

**Email from Johnson Akinbodunse – June 18, 2016**

**[Bates Number – YCC0005336]**

| **From:** | Johnson [jonsonakin@aol.com] on behalf of Johnson |
|---|---|
| **Sent:** | Saturday, June 18, 2016 3:27 PM |
| **To:** | pam@yellowcabsf.com |
| **Subject:** | Re: Reprimand letter regarding Tom Diesso |

Hi folks,

==Next meeting should be focused on ratifying or amending the draft Lease Agreement and anything else can wait. We have to get $$$$$ to the members ASAP . Members first!!!!==

Thanks
Johnson

Sent from AOL Mobile Mail

On Saturday, June 18, 2016, pam <pam@yellowcabsf.com> wrote:

Hi everyone,

Let's put this aside until Monday and discuss at the board meeting.

Thank you,

Pam

On Sat, 18 Jun 2016 11:43:47 -0700, Thomas Diesso <jake0778@gmail.com> wrote:

Where were you?The board was all their and was witness to the bad job you as chair did . I recommend that you be replaced as vice president. Obviously you don't know how to chair a meeting.

On Jun 18, 2016 11:09 AM, "D. Korkos" <dogdrive@mindspring.com> wrote:
This is a board only forum. The board should be aware of such admonishment recommendations before meetings for review purposes.

On Jun 18, 2016, at 10:49 AM, Thomas Diesso <jake0778@gmail.com> wrote:

Mr Korkos,
This is not the forum for your request,you should bring it up in next board meeting.Then we can discuss your actions as the chair allowing the meeting to turn as you said into chaos.
In the years that I have been a board member and a former vic president that chair

meetings,I know when someone is out of order.
At this critical period in our company you should be focusing your time on trying to solve our business problems and not take out a personal vendetta on me.

On Jun 18, 2016 8:57 AM, "D. Korkos" <dogdrive@mindspring.com> wrote:

> "The difficulty we have in accepting responsibility for our behavior lies in the desire to avoid the pain of the consequences of that behavior."
>
> — M. Scott Peck

On Jun 18, 2016, at 8:54 AM, D. Korkos <dogdrive@mindspring.com> wrote:

Reprimand letter regarding Tom Diesso
On June 14th, 2016 the Yellow cab co-op board of directors convened for it's weekly meeting. President Pam Martinez was attending by conference call and the meeting was chaired by the vice president.
During the meeting some members engaged in excessive crosstalk (speaking out of turn without being recognized by the chair). Such behavior results in chaos and stifles productivity. This happened twice. The first time resulted in a 15 minute recess.  The second time when members where asked to quiet down all members did except one — Mr. Tom Diesso.  He became louder, verbally abusive and threatened the chair with a recall vote.  He stated the did not have to be quiet and could not be told what to do.
This behavior cannot and should not be tolerated in a board room.  I strongly recommend that this letter of reprimand be put into Mr. Diesso's file and if such behavior happens again, he lose his right to speak during that meeting or asked to leave.  I also feel that Mr. Diesso owes the board an apology for disrupting the meeting.
Sincerely,
Dennis Korkos, Vice President
--
You received this message because you are subscribed to the Google Groups "BOD-2016" group.
To unsubscribe from this group and stop receiving emails from it, send an email to BOD-2016+unsubscribe@googlegroups.com.
To post to this group, send email to BOD-2016@googlegroups.com.
To view this discussion on the web visit
https://groups.google.com/d/msgid/BOD-2016/108580C7-F058-4907-B3DF-57FA04005B6B%40mindspring.com.
For more options, visit https://groups.google.com/d/optout.

--
You received this message because you are subscribed to the Google Groups "BOD-2016" group.
To unsubscribe from this group and stop receiving emails from it, send an email to BOD-2016+unsubscribe@googlegroups.com.
To post to this group, send email to BOD-2016@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/BOD-2016/29D9911D-2F3E-4D09-8F2B-A82D6568BA4F%40mindspring.com.
For more options, visit https://groups.google.com/d/optout.


--
You received this message because you are subscribed to the Google Groups "BOD-2016" group.
To unsubscribe from this group and stop receiving emails from it, send an email to BOD-2016+unsubscribe@googlegroups.com.
To post to this group, send email to BOD-2016@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/BOD-2016/4DC89F10-90E8-4599-86C9-88BA7F46D57B%40mindspring.com.
For more options, visit https://groups.google.com/d/optout.


--
You received this message because you are subscribed to the Google Groups "BOD-2016" group.
To unsubscribe from this group and stop receiving emails from it, send an email to BOD-2016+unsubscribe@googlegroups.com.
To post to this group, send email to BOD-2016@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/BOD-2016/CANN3y1BytsJqOmhGL1FsCdfdRpPhMOJ_160gqkvZACJcp%3DBKhA%40mail.gmail.com.
For more options, visit https://groups.google.com/d/optout.


--
You received this message because you are subscribed to the Google Groups "BOD-2016" group.
To unsubscribe from this group and stop receiving emails from it, send an email to BOD-2016+unsubscribe@googlegroups.com.
To post to this group, send email to BOD-2016@googlegroups.com.
To view this discussion on the web visit https://groups.google.com/d/msgid/BOD-2016/476d523a9497f5cc96fd1670976f5151%40yellowcabsf.com.
For more options, visit https://groups.google.com/d/optout.

# EXHIBIT E

**Email from Nate Dwiri – June 20, 2016**

**[Bates Number – YCC0049228]**

| From: | Nate Dwiri [nate@yellowcabsf.com] on behalf of Nate Dwiri |
|---|---|
| Sent: | Monday, June 20, 2016 5:31 PM |
| To: | Pamela Martinez |
| Subject: | Re: lease |

>

<mark>Idiotic. This Board needs to be gone.</mark>  I thought that part of this process was that everyone would sign an statement to the effect that they are giving up their interest in YCC in tandem with the lease.


 Well, the lease and the letter were presented to the board last week to
> review and have any questions answered.
> First, they gave the letter and lease out downstairs. This is even
> after I requested they just review make comments and NOT discuss with
> members outside the board.
> I was told I was a bully, in some sort of embezzlement scheme with you
> and Nate and they refuse to sign.
> A motion was made to put off giving the lease out until we have our
> town hall meeting with you and Gary. The corrections they want are:
> 1. 50.00/shift for gate. Not the full gate with a 40.00 refund.
> 2. 500.00 check.
> 3. In writing that we are still a coop and that the board is still active.
> They still don't understand the stipulation of Fair Market Value.
> They also believe Gary and you are in partnership and have a buyer for
> the property. I think I am part of that too.
> I really feel we must get a a meeting going the week of March 27,
> 2016, to get the right info out to our owners. Some of these board
> members are truly creating a poisonous and distrustful atmosphere on the lot.
> Pam
>
>
> Pamela Martinez
> Controller/President
> Yellow Cab Cooperative, Inc.
> 1200 Mississippi Street
> SF, Ca 94107
> Office:(415)593-9229   FAX:(415)826-7918
>
>
>

# EXHIBIT F

**Email from Pamela Martinez – May 10, 2013**

**[Bates Number – YCC0009596]**

```
        From: Phillip Ma
        Date: May 10, 2013 10:24 PM
          To: Pamela Martinez
          CC: Jim Gillespie
```

Hi Pam, Sorry for the confusion. This is because I see a $1,000,000 payable to banks - FRB LOC on the 11 months statement ending 3/31/2014, just wondering what are the terms, collateral, etc.

-----Original Message-----
From: Pamela Martinez [mailto:pam@yellowcabsf.com]
Sent: Friday, May 10, 2013 2:53 PM
To: Phillip Ma
Subject: Re: 18-25 Term Loan


> Hi Jim/Pam,
>
> FNB is very interested to assist Yellow Cab's needs.  Can you help
> with several preliminary questions below:
>
>
> 1.       Can you give us some ideas on the type of facility with First
> Republic , terms; collateral, etc.
THIS IS THE MORTGAGE ON 1200 MISSISSIPPI STREET.
>
> 2.       Net Income was lower in 2012 than 2011, but Patronage Dividends
> were greater.  How does Yellow Cab you calculate the amount of
> dividends to be paid per year?  Why did Yellow Cab pay out more than
> $2MM more than Net Income in 2012?
IT IS TRUE, WE PAID OUT MORE IN 2012. UNFORTUNATELY SUCCESS IN THIS BUSINESS IS
JUDGED BY THE NUMBER OF MEDALLIONS YOU HAVE AND THE LARGER THE NUMBER THE MORE
SOLVENT YOU ARE. IN 2012 WE SHOULD HAVE KEPT THE MONTHLY MEDALLION DIVIDEND THE
SAME AS 2011. BUT, THE SFMTA INCREASED THE AMOUNT OF MONEY WE SHOULD PAY FOR
RENTAL OF  A MEDALLION BY 500.00/MONTH (NON-OWNERS). THIS IN TURN MEANT WE MUST
KEEP OUR OWNERS HAPPY AND INCREASE THEIR MONTHLY PATR (REFLECTED IN ADJUST NOT
TRUE PATR DIV) BY A SIMILAR AMOUNT WHICH DECREASED OUR PROFITS. tHIS YEAR WITH
MORE MEDALLIONS IN THE FLEET WE ARE ALREADY SEEING A TRUER PATR / MONTH.
> Sorry for the inconvenience and again thanks for given us the
> opportunity to assets Yellow Cab's needs
>
>
>
> Please excuse my brevity and/or any grammatical errors.
>
> Philip Y. Ma
> First National Bank of Northern California
> 130 Battery Street
> San Francisco, CA 94111
> Phone: 415-287-8831
> Fax: 415-392-0740
> E-Mail: pma@fnbnorcal.com
>
> Email Confidentiality Statement: This email message contains
> confidential information belonging to the sender, which is legally
> protected. The information is intended only for the use of the
> individual or entity named above. Any review, use, disclosure or
> distribution by persons or entities other than the intended recipient
> is prohibited. If you are not the intended recipient, please contact
> the sender by reply and destroy all copies of the original message. Thank you.
>


Pamela Martinez

Controller
Yellow Cab Cooperative, Inc.
1200 Mississippi Street
SF, Ca 94107
Office:(415)593-9229   FAX:(415)826-7918

Email Confidentiality Statement: This email message contains confidential information belonging to the sender, which is legally protected. The information is intended only for the use of the individual or entity named above. Any review, use, disclosure or distribution by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient, please contact the sender by reply and destroy all copies of the original message. Thank you.

# EXHIBIT G

**Email from Pamela Martinez – January 9, 2015**

**[Bates Number – YCC0009889]**

```
From: Pamela Martinez
Date: January 9, 2015 10:19 PM
  To: Krisan, Craig (C.R.)
  CC: jbulin1@ford.com
```

I have attached the P&L.
The medallion fees were dropped to 1800.00. On 2/1/2015, ALL medallion
holders will be paid only 1400.00/month, with understanding that the rate
may still decrease.
I have also added some Q and A to show how we are further monitoring our
income and expenses....

==Why was the distribution over above the net income for 4/30/14?  Net==
==income was $5.3MM and distributions of $9.9MM?==

==This has been reviewed and corrected. Management (unwisely) bowed to==
==political pressure with owners and gave out more than the profits==
==generated. With new management as well as a new Board of Directors,this==
==has since been corrected and the PATR reflects a drop of almost 55% per==
==month.==

Why is there such a large volume of claims in both 2013 and 2014?  And
 what are they doing to prevent this rise in claims going forward?

The volume of claims is roughly the same. What you see are the settlements
for several claims that we are paying back on a monthly amount to
claimant. This allows us to have more operating funds daily. Also, these
are claims from 2010.
Preventative measures we have taken are: inside and out camera coverage
for each cab. This has cut down tremendously on he said, she said where
litigious San Francisco favors the claimant over taxicabs.
We have also implemented safety programs where good drivers are rewarded
monthly.By the same token we are able to get ride of drivers more easily,
because we have a firm watching all social media reviewing all discussions
regarding YCC drivers. Again, upon review of the camera footage we can
determine if drivers are driving poorly.

 What do you think claims will be by year end 2015?  And what do you
 project the distribution will be?

As explained above, PATR distributions have been cut by 55%. The profits
are monitored monthly and the figures I present to our Board are now
reviewed and verified before a dividend check is issued to our owners.
As far as claims, I can only guess that with all our safety improvements
and the end of 2014 our claims have stayed the same or decreased a little.
This is considering we have 100 more cabs on the street than last year.

> Hi Pam,
>
> Just wondering if you could provide me the most recent financial
> statements that you have prepared.  The most recent I have is September
> 2014.  Also with respect to your comment below regarding a decrease in
> Jan./Feb. to $1,100 per medallion, are you referring to the patronage
> dividend?
>
> Thank you very much!
>
> Craig Krisan
> Commercial Fleet Manager

> Ford Credit - West Market Area
> 925-351-6205
> ckrisan@ford.com
>
> From: pam [mailto:pam@yellowcabsf.com]
> Sent: Friday, December 12, 2014 2:58 PM
> To: Krisan, Craig (C.R.); verducciford@gmail.com
> Cc: Bulin, Joe (J.A.)
> Subject: Re: FW: Oct 2014 P & L
>
>
> Hi Chris,
>
> I attached the section from the Rules and Regs for the SFMTA. At that time
> and prior to it we explained to them this would be a major detriment to
> our bottom line. SFMTA was very concerned with rogue groups that were
> making a lot of money renting out groups of medallions they had no control
> over. Even with our meticulous records and following their rules they felt
> they could not bend their rules for us. At 4,850.00/medallion/month gross,
> this has made a major impact.
>
> We have cut back permit rental to 1800.00 thru December and the patronage
> dividend is at 1779.00/medallion.
>
> Begining in Jan/Feb we will decrease to an average of 1100.oo/medallion.
> We are in earnest talks with the SFMTA to make up a new program similar to
> the LTL program within their new guidelines
>
>
>
>
>
> On Wed, 10 Dec 2014 23:36:25 +0000, "Krisan, Craig (C.R.)" wrote:
> Hi Pam,
>
> Joe Bulin forwarded me the financial statements you provided to him as of
> 9/30/2014.  I do need a clarification on one particular item, which I hope
> you can provide.  It has to do with income item 5110 Long Term Lease
> Income on the YTD income statement (attached).  I know that during our
> meeting in early October with Jim we discussed what this item was and why
> it lower year over year but unfortunately my notes from the meeting
> didnât capture the details.  Can you please provide an explanation on
> the specifics?  I remember it had to do with changes put forth by the
> SFMTA.
>
> Thank you.
>
> Craig Krisan
> Commercial Fleet Manager
> Ford Credit - West Market Area
> 925-351-6205
> ckrisan@ford.com<mailto:ckrisan@ford.com>
>
> From: Bulin, Joe (J.A.)
> Sent: Friday, December 05, 2014 2:26 PM
> To: Krisan, Craig (C.R.)
> Subject: FW: Oct 2014 P & L
>
>
>
> Sent from iPhone 5C with Good (www.good.com<http://www.good.com>)
>
> -----Original Message-----
> From: Pamela Martinez [mailto:pam@yellowcabsf.com<mailto:pam@yellowcabsf.com>]

> Sent: Friday, December 05, 2014 05:24 PM Eastern Standard Time
> To: verducciford@gmail.com<mailto:verducciford@gmail.com>
> Cc: Bulin, Joe (J.A.)
> Subject: Oct 2014 P & L
>
>
> see attached
>
> Pamela Martinez
> Controller
> Yellow Cab Cooperative, Inc.
> 1200 Mississippi Street
> SF, Ca 94107
> Office:(415)593-9229   FAX:(415)826-7918
>
>
>


Pamela Martinez
Controller
Yellow Cab Cooperative, Inc.
1200 Mississippi Street
SF, Ca 94107
Office:(415)593-9229   FAX:(415)826-7918

# EXHIBIT H

**Email from Pamela Martinez – April 7, 2016**

**[Bates Number – YCC0003583]**

| | |
|---|---|
| **From:** | D. Korkos [dogdrive@mindspring.com] on behalf of D. Korkos |
| **Sent:** | Friday, April 08, 2016 9:51 AM |
| **To:** | ggnolot@yahoo.com |
| **Cc:** | Pamela Martinez; sinadainternational@yahoo.com; shel.miller@gmail.com; mdf1389 @hotmail.com; jake0778@gmail.com; lakewm@sbcglobal.net; arthurktse@icloud.com; nbastanmehr@yahoo.com; Johnson  Akinbondunse; tim@yellowcabsf.com; ali@yellowcabsf.com; hal@yellowcabsf.com |
| **Subject:** | Re: Conspiracy Theories |

To the Board only:

Nobody likes George's work, equipment, ideas or even his personality — except maybe Nate. Any association with him generates a negative atmosphere.

I understand the reasons for his 1 year contract.  I may not agree with those reasons but we've put ourselves into a corner and didn't have much choice.

I agree with Gerard that the board should have been advised before hand, but now it's kind of a moot point.

By the time we are ready or can afford to switch to another I T system, George's contract will be, at least, half way expired.  I would gladly give him half a year's salary to see him go.

Dennis


> On Apr 7, 2016, at 10:56 PM, <ggnolot@yahoo.com> <ggnolot@yahoo.com> wrote:
>
> Dear Pam,
>
>
> I do not know who you are referring to but personally I was disappointed that this important decision, considering how controversial Mr Anderson has become, was taken without consulting the board. I did listen, and I understand your reasoning, and maybe we can not find anybody else within a year. But in any case, the contract was already signed and it was too late to complain or argue.
> I was also very disappointed about the decision of shrinking the free shift without consulting the board.
> Considering Management has final say, I do not see the wisdom of not consulting the board before making decisions.This behavior has led to disastrous results previously and in light of the fact we are going to have a less than experienced G.M very soon, it is my opinion that we should demand the board to be consulted before important decisions.
>
> Respectfully,
>
> Gerard
>
>
>
> From: Pamela Martinez <pam@yellowcabsf.com>
> To: Pamela Martinez <pam@yellowcabsf.com>; ggnolot@yahoo.com;

> sinadainternational@yahoo.com; shel.miller@gmail.com;
> mdf1389@hotmail.com; jake0778@gmail.com; lakewm@sbcglobal.net;
> arthurktse@icloud.com; nbastanmehr@yahoo.com; jonsonakin@aol.com;
> dogdrive@mindspring.com; tim@yellowcabsf.com; ali@yellowcabsf.com
> Cc: hal@yellowcabsf.com
> Sent: Thursday, April 7, 2016 4:40 PM
> Subject: Conspiracy Therories
>
> At the meeting on Tuesday, I brought up the fact after much discussion
> and talking back and forth, Hal and I concluded our YCC interest would
> be best served if we signed a one year contract with Yellow Card Services.
> The major reasoning behind this nefarious act occurred when I demanded
> to know why YCS was NOT representing our interest with CMT and
> Verifone against the SFMTA and Flywheel. George explained that without
> the contract we technically were not his client. Bartering back and
> forth from a 4 year contract to the decided on 1 year contract, I
> signed. Nobody reacted or revolted at the meeting regarding this act.
>
> I have not received any money from YCS, not any part of any percentage
> and not one dollar. I am insulted that the Conspiracy Yellow Theorists here
> at Yellow have added me to the clump of those they feel have been
> robbing YCC and believe this is the reason I signed this contract. Not
> one member has been honest enough to come to me and address this issue
>
> Listed below are all the expenses paid for yearly by YCS out of the
> "extra" 1.5%; a total that comes to roughly a half a million dollars.
> Anyone wanting to get more detail come and see me for the FACTS.
>
> I am disappointed and very dis-heartened to realize some of the very
> colleagues I work with at every board meeting feel so dis-trustful of me.
> Pam
>
>
>
> Services and Equipment
>
> Internet services 1200 Mississippi, 323 20th St, 204 Baden St Phone
> services for callout and confirm Phone services for Las Vegas call
> center Phone equipment maintenance agreements PBX License Fees Mobile
> Data Services Mobile Data VPN Firewall Security Licensing Colocation
> Service for redundant services Mandated SFMTA data collection and
> reporting Servers and desktop computers In taxi equipment including
> Mobile Data Terminal,Payment Terminal,Terminal Interface Unit,cables,
> mounting hardware, and spare parts Chargebacks Pay card and ACH for
> non credit card payments New program development at no charge
> Consultation services
>
>
>
> This e-mail is confidential and for the use by the addressee only.  If
> the message is received by anyone other than the addressee, please
> return the message to the sender by replying to it and then delete the
> message from your computer.
>
>
>
>

```
> Pamela Martinez
> Controller/President
> Yellow Cab Cooperative, Inc.
> 1200 Mississippi Street
> SF, Ca 94107
> Office:(415)593-9229  FAX:(415)826-7918
>
```

# EXHIBIT I

**Email from Zee Sinada – March 3, 2016**

**[Bates Number – YCC0002559]**

| | |
|---|---|
| **From:** | Maurice Harold [mauriceharold10@gmail.com] on behalf of Maurice Harold |
| **Sent:** | Thursday, March 03, 2016 11:02 PM |
| **To:** | zee sinada |
| **Cc:** | Peter Deme; Johnson Akinbodunse; tim@yellowcabsf.com; Nasser Bastanmehr; mdf1389 @hotmail.com; Arthurktse; Lakew Melese; Lawrence Song; Thomas Diesso; Pam Martinez |
| **Subject:** | Re: Tomorrow |

No we are not!

On Mar 3, 2016 11:00 PM, "zee sinada" <sinadainternational@yahoo.com> wrote:
We are back to SQUARE one !!!!

On Thursday, March 3, 2016 10:45 PM, Maurice Harold <mauriceharold10@gmail.com> wrote:


Zee,I agree that it is the Boards decision to make, not the President's but I think it is a very  good move to have someone  with Hal's experience to help the new GM  they will need all the help they can get.I think the membership would very unhappy  if they heard we had turned down this offer.I will vote yes to have Hal's help us
Maurice
On Mar 3, 2016 10:31 PM, "zee sinada" <sinadainternational@yahoo.com> wrote:
Pam,
It would have been better if you had talked to the board before you asked Hal to fill any positon. the board had no good relation with the previous GM and i dont think the shareholders will aprove that choice............
Zee.


On Thursday, March 3, 2016 3:36 PM, Thomas Diesso <jake0778@gmail.com> wrote:


Thanks Pam got it
On Mar 3, 2016 3:33 PM, "Maurice Harold" <mauriceharold10@gmail.com> wrote:
Thank  you  Pam that is very good news
On Mar 3, 2016 3:28 PM, "Pamela Martinez" <pam@yellowcabsf.com> wrote:
Greeting Fellow Board Members,

Yesterday, Jim Gillespie, General Manager, gave 30 day notice to terminate his contract with Yellow Cab Cooperative, Inc.. March 3, 2016 in the morning, by mutual agreement it was decided that his last day in the office will be Friday, March 4, 2016.
As a result, there is a vacancy in the GM position. I asked our former GM, Hal Mellegard to fill in this critical position for 3 to 6 months. During this time besides all the duties of General Manager, he will train the next successor chosen by the Board of Directors.
His contract will be presented to the Board at tomorrow's meeting.

Sincerely,

Pamela Martinez
Controller
Yellow Cab Cooperative, Inc.
1200 Mississippi Street
SF, Ca 94107
Office:(415)593-9229   FAX:(415)826-7918

# EXHIBIT J

**Proposed Order**

DOCS_SF:92182.5

John D. Fiero (CA Bar No. 136557)
Jason H. Rosell (CA Bar No. 269126)
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
E-mail:   jfiero@pszjlaw.com
              jrosell@pszjlaw.com

Counsel to the Official
Committee of Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>YELLOW CAB COOPERATIVE, INC.,<br><br>Debtor. | Case No. 16-30063 (DM)<br><br>Chapter 11<br><br>**ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**<br><br><u>Hearing Held:</u><br><br>Date:  October 21, 2016<br>Time:  10:00 a.m.<br>Location:  450 Golden Gate Avenue<br>         16th Floor, Courtroom 17<br>         San Francisco, California<br>Judge:  Hon. Dennis Montali |

This matter came before the Court on October 21, 2016, upon consideration of the *Motion for Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 329] (the "**Motion**") and the responses thereto.  Appearances were as noted in the record.  For the reasons stated on the record, and good cause appearing therefore;

**IT IS HEREBY ORDERED THAT:**

1.     The Motion is **GRANTED**.

2.     The United States Trustee is directed to appoint a chapter 11 trustee in the above-captioned case.

** END OF ORDER **